PAPERNO *v.* MICHIGAN RAILWAY ENGINEERING CO.

1. EXECUTORS AND ADMINISTRATORS—COLLATERAL ATTACK—DOMICILE.

   The question of decedent's residence in a certain county, raised in a collateral attack upon the validity of plaintiff's appointment, may not be retried in an action by the administrator for the negligent death of plaintiff's decedent.

2. SAME—TREATY RIGHTS—CONSTRUCTION—FOREIGN CONSULS.

   The treaty of 1832 between the United States and the Emperor of Russia (8 U. S. Stat. 444, 448), giving to that country all the privileges and powers enjoyed by the most favored nations, and the treaty of 1853 with the Argentine

---

See notes in 45 L. R. A. 496; 37 L. R. A. (N. S.) 549.
202—Mich.—17.

Republic (10 U. S. Stat. 1005), giving to the consuls of that country "the right to intervene in the possession, administration, and judicial.liquidation of the estate of a deceased subject of that country," as construed by the United States Supreme Court (*Rocca* v. *Thompson*, 223 U. S. 317), do not give the right to Russian consuls to administer the estates of Russian subjects dying in this country.

3. SAME—INTERNATIONAL LAW—COMITY OF STATES.
  But under the law of nations and the doctrine of comity, a consul of the Russian government, perforce of both his duty to conserve the estate of a deceased subject of his government, and as representative of the next of kin, who were also subjects of his government, had the right to institute proceedings for the appointment of an administrator.

4. SAME—FOREIGN CONSULS—NOTICE—PROBATE PROCEEDINGS.
  The State of Michigan recognizes the right of consuls to notice of probate proceedings where there are subjects of foreign countries interested (section 13837; 3 Comp. Laws 1915).

5. MASTER AND SERVANT—NEGLIGENCE—SAFE PLACE—ELECTRICITY —STREET RAILWAYS.
  In an action against a railroad construction company, not operating under the workmen's compensation law, for the death of an employee by coming in contact with the third rail while engaged in construction work, evidence as to defendant's negligence in failing to cover the third rail on the occasion of decedent's death, although on other occasions it had been covered, *held*, to present a question for the jury.

6. SAME—DAMAGES—DEATH ACT—DEPENDENTS.
  There being competent evidence that decedent on several occasions had sent money to his mother in Russia, the court below was not in error in submitting to the jury the question of the amount of damages recoverable under the death act in case they found that death was instantaneous, where the court carefully limited the recovery to the amount that would fairly compensate the mother for her pecuniary loss.

7. SAME—DEATH ACT—INSTANTANEOUS DEATH—EVIDENCE.
  Evidence *held*, to present a question for the jury as to whether death was instantaneous.

8. SAME—WEIGHT OF EVIDENCE.
    There being sufficient testimony to take the case to the
    jury, *held*, that the verdict for plaintiff was not against
    the clear weight of the evidence.

Error to Kalamazoo; Weimer, J. Submitted February 1, 1918. (Docket No. 182.) Decided July 18, 1918.

Case by Solomon G. Paperno, administrator of the estate of Alexander Bichek, deceased, against the Michigan Railway Engineering Company for the negligent killing of plaintiff's intestate. Judgment for plaintiff. Defendant brings error. Affirmed.

*Alfred J. Mills*, for appellant.

*Asher L. Cornelius*, for appellee.

FELLOWS, J. Plaintiff's decedent, a Russian subject, was killed on May 15, 1915, while in the employ of the defendant. The parties were not operating under the workmen's compensation act. Defendant was constructing an electric line from Kalamazoo to Grand Rapids. The line had not been put in operation for the public, but it was sufficiently complete so that cars were being run over it. It was operated by the "third rail" system, carrying 2,400 voltage. The third rail was from 30 to 32 inches from the track rail. The gang with which decedent was working was engaged in aligning the track. Decedent and others were between the third rail and the track rail with iron bars preparing to heave the track over on receiving the signal so to do. In some way deceased fell, his foot coming in contact with the third rail; there is also some testimony that the iron bar which he held in his hand came in contact with both the third rail and the track rail. It is claimed that defendant was negligent in not providing a safe place and safe tools with

which to work; that it should have covered the third rail to protect the employees working near it when it was so heavily charged with electricity, and should have provided insulated tools with which to work. The accident occurred in Allegan county, where the gang was then staying, and plaintiff was appointed administrator by the probate court of that county on the 14th day of January, 1916, on the petition of Antoine Wolff, imperial Russian consul for the consular district within which this State is included. We shall have occasion to detail the facts more fully as we proceed.

Defendant insists that the plaintiff may not maintain this action for the reason that he had not been validly appointed administrator of the estate of decedent. It is pointed out that the proof shows decedent to have been a resident of Kalamazoo and but temporarily in Allegan county when he met his death; it is also insisted that the Russian consul for this consular district had not sufficient authority to confer jurisdiction by his petition on the probate court for Allegan county to make the appointment. It must be borne in mind that we are not here dealing with an appointment of a special administrator, or the issuance of ancillary letters of administration, which are *ex parte*, and both without notice of hearing, nor with a direct proceeding to review the judgment of the probate court. The question here raised is by collateral attack upon a decree of the probate court. Upon such attack the court may not retry the question of residence. *Carney* v. *Carney*, 199 Mich. 663. If, however, the probate court acquired no jurisdiction under the petition filed another question is presented. We do not understand it to be claimed that the proceedings of the probate court of Allegan county do not comply with the statute, nor that decedent had any near relatives within this jurisdiction.

Plaintiff insists that by treaty with Russia, the right to administer the estates of Russian subjects dying in this country is given to the Russian consul. By the treaty of 1832, between this country and His Majesty the Emperor of all the Russias (8 U. S. Stat. 444, 448), it was provided by Art. 8:

"The two contracting parties shall have the liberty of having, in their respective ports, consuls, vice-consuls, agents and commissaries of their own appointment, who shall enjoy the same privileges and powers, as those of the most favored nations;   *   *   **"

By this provision the Russian consuls were given the privileges and powers of the consuls of the most favored nations, thus provisions in the treaties between this and other countries granting powers to consuls gave to Russian consuls the powers of consuls of the most favored nations. The treaty concluded between this country and the Argentine Confederation, July 27, 1853 (10 U. S. Stat. 1005), gives broad powers to the consuls of that republic. Such powers as are given by the Argentine treaty inure to the benefit of Russian consuls under the "most favored nations" clause. By Art. 9 of the last named treaty, it is provided:

"If any citizen of either of the two contracting parties shall die without will or testament, in any of the territories of the other, the consul-general or consul of the nation to which the deceased belonged, or the representative of such consul-general or consul, in his absence, shall have the right to intervene in the possession, administration, and judicial liquidation of the estate of the deceased, conformably with the laws of the country, for the benefit of the creditors and legal heirs."

The question of the power and privileges of consuls under the most favored nations clause has not been before the courts with any degree of frequency. In some cases the right of the consul perforce of his office

to be appointed administrator of the estates of the subjects of his sovereign has arisen. In *McEvoy* v. *Wyman*, 191 Mass. 276, and in *Carpigiani* v. *Hall*, 172 Ala. 287, such right was upheld. In the Massachusetts case the question arose between the consul and the public administrator provided for by the laws of the State. In *Re Fattosini's Estate*, 67 N. Y. Supp. 1119, and in *Re Lobrasciano's Estate*, 77 N. Y. Supp. 1040, the surrogate's court for Westchester county, New York, upheld such right, while in *Re Logiorato's Estate*, 69 N. Y. Supp. 507, the right of the consul as a right was denied, but the consul was appointed. We shall have occasion to refer to this case later. In *Lanfear* v. *Ritchie*, 9 La. Ann. 96, the right was denied. The supreme court of California, in *Estate of Ghio*, 157 Cal. 552, denied the right of the consul to be appointed administrator. As this case was reviewed in the United States Supreme Court and is the case in which that court construed the clause of the Argentine treaty, above quoted, the case is of prime importance. The State of California has a public administrator. By its statutes he shall act as administrator in the absence of next of kin entitled to inherit. The deceased was a subject of Italy, the consuls of which nation by its treaty with this country, were entitled to the benefit of the most favored nations clause. Both the Italian consul and the public administrator petitioned for appointment as administrator. The court thus clearly stated the issue:

"Our law declares that in the absence of next of kin entitled to inherit, the public administrator shall take charge of and administer the estate for the benefit of the creditors and heirs. The right claimed under the treaty is that, in such a case, the consul of the country of which the deceased was a citizen shall take charge and administer; a right directly in conflict with our law."

The court sustained the right of the public adminis-

trator to the appointment; but it is worthy of note that in the concluding portion of the opinion, in discussing the duty and rights of the consul, the court said:

"He has, in addition a duty pertaining to his office imposed upon him by his own government, that of seeing to the safe keeping and proper disposition of the effects of citizens of his country who may die while traveling, or while temporarily present in the country to which he is accredited, or even while residing therein, and for that purpose, in the absence of any other representative of the deceased having a better right, he may 'intervene in the possession' of the estate, conformably with the laws of the country. The custom of nations would permit this and it may be that, if the public administrator refuses or fails to apply, the consul may petition for and receive letters to himself as the official agent for the persons interested."

The case went to the Supreme Court of the United States, where it was affirmed. *Rocca* v. *Thompson*, 223 U. S. 317. The case deals extensively with the subject and the construction of the word "intervene" found in the treaty with the Argentine Republic. The language of that treaty was construed not to give to the consul the right to administer the estate, and the law of California, with reference to administration by the public administrator, was held to control. We must, therefore, assume that the law is settled that the consul of the Russian Government, perforce of the treaty with this country, was not entitled to administer this estate.

But our problem in the instant case is but partially solved when we have reached this conclusion. There still remains the question for solution as to whether the consul, perforce of his official position, may initiate probate proceedings by petitioning for administration of the estate of a deceased subject of his sovereign, and where, as here, the next of kin are subjects of the

country from which he is accredited. This involves his powers and privileges under the laws of nations and the doctrine of comity:

"A consular officer is, by the law of nations and by statute, the provisional conservator of the property within his district belonging to his countrymen deceased therein." 2 Cyc. p. 271.

"A foreign consul, without specific authority, has the general right to protect the rights and property of persons of his nation within the jurisdiction of his consulate, and he may bring suits for such purpose without any special authority from the parties in interest." 2 C. J. p. 1307.

"One of the most important duties pertaining to the office of a consul and imposed upon him by his own government is that of seeing to the safekeeping and proper disposition of the effects of citizens of his country who may die while traveling or while temporarily present in the country to which he is accredited or even while residing therein. In the absence of any other representative of the deceased having a better right, a consul is authorized to intervene in the possession of the estate conformably to the laws of the country. There can be no possible doubt concerning the general propriety of such a practice. The duty, and by comity the authority, of a consul to receive and care for the personal estate of a citizen of his own country who may die within his consulate, and to protect the estate from spoliation, is prescribed and recognized by all civilized nations." 9 R. C. L. p. 158.

Secretary of State Marcy, in a letter to Mr. Aspinwall on August 21, 1855, after requesting consuls of our government to act as administrators of the estates of deceased citizens of this country who die in foreign countries, said:

"Indeed, this is one of the most sacred and responsible trusts imposed by their office, and in this respect they directly represent their government in protecting the rights and interests of the representatives of deceased citizens." 1 Wharton International Law Dig. p. 782.

Recurring again to *In re Logiorato's Estate, supra,* we find that while the court there construed the treaty with the Argentine Republic as later did the United States Supremé Court, and, therefore, held that, perforce of his official position, the consul was not entitled to the appointment as administrator, an examination of the case discloses that the petition for the administration of the estate was made by the consul and the consul was appointed administrator; the real question in the case was whether the consul, if appointed, should be required to give a bond. The cases quite unanimously agree that where a foreign consul is appointed he should be required to give the usual administrator's bond, as are other administrators, and we think such is the established practice.

While the supreme court of Louisiana held in *Lanfear* v. *Ritchie, supra,* that the consul was not entitled to the appointment as administrator, in the later case of *Succession of Rabasse,* 47 La. Ann. 1452, the same court had before it the right of the French consul, under the treaty between this country and France, to appear for French heirs in a proceeding in which they were interested. The court sustained such right, and held that the consul had the same right to represent them, by force of the treaty and his office, that he would have had by force of express authority from them; the court saying:

"In our view the stipulation in this treaty puts the delegate in the position of an agent of the French heirs, with the same effect as if he held their mandate to represent them as heirs."

The Supreme Court of the United States in 1821 fixed the status of foreign consuls in the case of *The Bello Corrunes,* 6 Wheat. (U. S.) 152. The court there said:

"On the first point made by the attorney general, this court feels no difficulty in deciding, that a vice-

consul duly recognized by our government, is a competent party to assert or defend the rights of property of the individuals of his nation, in any court having jurisdiction of causes affected by the application of international law. To watch over the rights and interests of their subjects, wherever the pursuits of commerce may draw them, or the vicissitudes of human affairs may force them, is the great object for which consuls are deputed by their sovereigns; and in a country where laws govern, and justice is sought for in courts only, it would be a mockery to preclude them from the only avenue through which their course lies to the end of their mission. The long and universal usage of the courts of the United States, has sanctioned the exercise of this right, and it is impossible that any evil or inconvenience can flow from it."

But the court, having fixed the right of the consul to institute proceedings in court, further said:

"Whether the powers of the vice-consul shall in any instance extend to the right to receive in his national character, the proceeds or property libelled and transferred into the registry of a court, is a question resting on other principles. In the absence of specific powers given him by competent authority, such a right would certainly not be recognized."

This State recognizes the right of consuls to notice of probate proceedings where there are subjects of foreign countries interested. 3 Comp. Laws 1915, § 13837.

We conclude, therefore, from our examination of this question that this consul of the Russian government, perforce of both his duty to conserve the estate of a deceased subject of his government, and as representative of the next of kin who were also subjects of his government, had the right to institute proceedings for the appointment of an administrator.

Defendant insists that there was no evidence of negligence. This was one of the reasons assigned in the motion and requests for a directed verdict and for

judgment *non obstante* under the Empson act (Act No. 217, Pub. Acts 1915, 3 Comp. Laws 1915, § 14568 *et seq.*). We cannot agree with this contention. There was testimony pro and con by men experienced in railroading on this subject, most of it directed to the question of covering the third rail so as to prevent contact with it while employees were working in close proximity to it. The third rail was protected on both sides and defendant had provided a plank or board to cover over the top of the rail to prevent injury to employees by contact with it when they were performing certain kinds of labor. It was not so protected on this occasion. Defendant insists that in aligning the track they moved from place to place so frequently as to render this covering of the track impractical. We do not think the testimony makes out a case where we can say, as matter of law, that defendant's claim, that under all the testimony its negligence is not proven, is undisputed. It is not made to appear that on these occasions when the track was covered the dangers were so much greater than on the occasion in question, as to prompt a covering of the third rail on one occasion and not on another. One of the witnesses testified:

"When the bosses were coming, the road master or some other high official, they were told to cover up the third rail but when there wasn't anybody there they didn't have to cover up."

While an employee of defendant and who, from his testimony, appears to have been its engineer or in charge of construction, among other things, testified:

"Working around this rail is a hazardous occupation, so dangerous that when we call our men to shovel anywhere around it we make a practice of guarding the rail with a board on top of it. * * *

"We kept all our men away from the third rail, and the work was done more from the center of the track than the ordinary third rail road would be. On the ordinary third rail road with a low voltage they don't

pay very much attention to the third rail, itself, but in our case we had to—we did our work very much different, to keep them in the center between the rails. One of the differences in doing the work was, in aligning the track we kept our men in the center of the track more than would be customary with the ordinary railroad. Another difference was, if a man, if a man had to, in an ordinary third rail road, he would simply work around the third rail and step back and forth over it and pay no attention particularly to it, but in our case, if a man had any business on the third rail or around it, we covered the rail so he could not come in contact with it."

We cannot say upon this record that no negligence of the defendant was proven; this third rail carrying a high voltage was exceedingly dangerous; contact with it meant almost certain death. Defendant was put to work in the space between it and the running rail from 30 to 32 inches wide. It had been raining and the ground was slippery.

"The handling of electrical currents of high voltage is a business extremely hazardous, and those engaged in that business are charged with the duty of exercising a very high degree of care for the protection of life." *Huber* v. *Electric Co.*, 168 Mich. 531.

The case was submitted to the jury on the theory that if death was instantaneous the death act applied and the measure of damages recoverable under that act was stated to the jury. The case was also submitted to the jury upon the theory that if they did not find the death to be instantaneous then the recovery, if one was had, must be under the survival act, and the measure of damages under that act was stated to the jury.

Defendant insists: That there can be no recovery under the death act, because there is no competent evidence that deceased left dependents toward whose support he contributed; nor may there be a recovery under the survival act, because the evidence shows con-

clusively that death was instantaneous, and that therefore no recovery may be had under either act. The evidence discloses that decedent left surviving him a mother, aged 63 years, a resident of Russia. There was testimony by a witness who knew and lived near decedent and his mother in the old country, that she worked a small farm and received money from deceased. There is testimony that on three occasions deceased sent his mother money; on one occasion 50 roubles, on another occasion 120 roubles, and on another occasion 150 roubles. It was competent for the plaintiff to show these transactions by witnesses who accompanied deceased when he went to the bank on these different occasions; it was competent to show that he sent Russian roubles to his mother by mail, and it was permissible to show by the witness that he knew the money was being sent to her because he saw her name. The books of the bank might be more convincing, but, under the circumstances, they were not of a higher grade of evidence so as to exclude the offered proof upon the ground that it was not the best evidence obtainable. There was evidence that the bank he went to on some of these occasions was in another State and at the time of the trial was out of existence. But defendant insists that even if the testimony was admissible the case is controlled by *Ormsbee* v. *Railway Co.*, 197 Mich. 576. The instant case is clearly distinguishable from that case. There the father (decedent), as a matter of parental good will, made some slight gifts, purely voluntary donations, to his adult children, all of whom were comfortably married and living apart from him, and none of whom were legally entitled to support from him. Here the deceased, who was legally obligated to support his mother, sent her cash from his earnings to discharge such obligation. The case on this question is not unlike *Kalcic* v. *Newport Mining Co.*, 197 Mich.

364. The trial court very carefully limited the recovery, if death was instantaneous, to the amount that would fairly compensate the mother for her pecuniary loss. There was testimony justifying the submission of this question to the jury, and there was no error in the manner of its submission.

There was a sharp conflict in the testimony as to whether the direct cause of the death continued to operate directly upon the injured person until life was extinct. The jury would have been justified in finding from some of the testimony that decedent had expired when he was removed from the third rail and contact with the current ceased, and that such evidences of life as continued were but spasmodic muscular movements. On the other hand, there was testimony that decedent continued to breathe for some seventeen or eighteen minutes after he had been removed from the third rail and the direct cause of death had ceased to operate directly upon him; that on three occasions during this time, and a few minutes apart, he used a Russian expression equivalent to our expression of pain, "Oh!" the first two of these quite strong and the third in a whisper; and that at the expiration of the time above stated he looked around at his companions, several of whom were Russians, sighed and ceased to breathe. We are impressed that there was sufficient testimony to take this question to the jury. *Olivier* v. *Railway Co.,* 134 Mich. 367; *Ely* v. *Railway,* 162 Mich. 287; *Lobenstein* v. *Iron Works,* 192 Mich. 118.

We are satisfied that there was testimony taking the case to the jury and that the verdict was not against the clear weight of the evidence. We have examined all the errors assigned and find no reversible error.

The judgment will be affirmed.

BIRD, MOORE, STEERE, BROOKE, and STONE, JJ., concurred. OSTRANDER, C. J., and KUHN, J., did not sit.