### SWACZYK *v.* DETROIT EDISON CO.

1. DEATH—ACTION—DEATH ACT—SURVIVAL ACT—TEST.

   The recognized test in this State distinguishing between the two causes of action, survival and instantaneous death, is whether the active cause of death continued to operate directly upon the injured person until life was extinct; that he did not regain consciousness is not a test of instantaneous death.

2. SAME—ELECTRICITY—INSTANTANEOUS DEATH—EVIDENCE—QUESTION FOR JURY.

   Testimony by a disinterested witness that deceased lived about an hour after he found him lying on the ground in contact with a "live wire," which was supplemented by the testimony of two boys, companions of deceased, to the same effect, *held*, to present a question of fact for the jury as to whether death was instantaneous.

3. SAME—ELECTRICITY—INSPECTION—NEGLIGENCE—TRIAL.

In an action for the death of a boy caused by his coming in contact with a live wire which defendant had left attached to a lunch wagon standing in front of a vacant lot after service was discontinued, and which fell to the ground after said wagon was moved by a third party without defendant's knowledge or consent, the trial court was not in error in submitting the case to the jury on the issue as to whether such time had elapsed since the wires fell upon the ground and became a public menace that defendant should have observed their dangerous condition and remedied it, in the exercise of reasonable care and vigilance in the conduct of its business under the circumstances shown, and in view of the dangers connected with the business in which it was engaged.[1]

4. SAME—PLEADING—DECLARATION—INSPECTION.

Although the declaration did not contain the words "inspect" or "inspection," the conclusion of the trial court that there was enough in the declaration to warrant the submission to the jury on that issue, *held*, justified.

5. SAME—NEW TRIAL—WEIGHT OF EVIDENCE.

*Held*, that the verdict for plaintiff was not so against the weight of the evidence as to require a reversal.

6. DAMAGES—DEATH—SURVIVAL ACT—EXCESSIVE VERDICT.

In an action under the survival act for the death of a boy 13 years old, by electrocution, where the evidence shows that he lived only about an hour after the injury, and the distinction between the "survival act" and the "death act" in this case is largely technical, there being no long period of suffering of mental and physical distress warranting a large verdict to the actual survivor, the verdict for $6,500 *held*, to a degree excessive, and reduced to $5,000, for which amount judgment is affirmed conditional on acceptance.[2]

Error to Wayne; Hosmer, J.   Submitted June 3, 1919.   (Docket No. 10.)   Decided October 6, 1919.

Case by Stanislaus Swaczyk, administrator of the

---

[1] On the general rule relating to duty of electric company to prevent contact of wires carrying electric current, see note in 52 L. R. A. (N. S.) 587.

[2] On excessiveness of damages for personal injuries resulting in death, see comprehensive note in L. R. A. 1916C, 820.

estate of Stanley Swaczyk, deceased, against the Detroit Edison Company for the negligent killing of plaintiff's decedent. Judgment for plaintiff. Defendant brings error. Affirmed, conditionally.

*Oxtoby & Wilkinson* (*McKee Robinson,* of counsel), for appellant.

*Clarence P. Milligan,* for appellee.

STEERE, J. Defendant appeals from a judgment for $6,500 rendered against it in this action of tort for the death on March 21, 1917, of plaintiff's son, Stanley Swaczyk, a boy 13 years of age, caused by his coming in contact with a live service wire of defendant lying on the ground in a vacant lot on the west side of Russell street between Medbury and Palmer avenues, in the city of Detroit. The wire extended from an electric light pole in an alley at the back of the lot to an idle lunch wagon which had stood when in use at the sidewalk line on Russell street but at the time of the accident had been moved back on the lot some distance, causing a slack in the wires.

Prior to March, 1917, this vacant lot was resorted to as a playground by children of the vicinity at their pleasure and frequently crossed for a short cut in travel by any one finding it convenient so to do. At one time it was temporarily occupied for a carnival. Later this lunch wagon was moved upon the lot and placed for business purposes on the sidewalk line of Russell street. A Mrs. Parsons had a permit to use it for a restaurant from November 1, 1916, to November 1, 1917. She applied to defendant for electric service at the wagon, which was furnished her with the customary connection and meter from December 21, 1916, to January 25, 1917, when it was discontinued and the meter removed. The unoccupied wagon was left on the lot and the service wires to it from

the pole in the alley were left connected by defendant in anticipation that some one might thereafter use the wagon at that point and require electric service, it being customary in such cases, as defendant's evidence showed, to leave such wires connected when removing the meter, in readiness to give prompt electric service to the next occupant. As the wagon then stood and the wires were left no question is raised but that they were put up in a proper manner and left in a reasonably safe condition. It was said to be a frequent occurrence for defendant to furnish electric service in the city of Detroit for a longer or shorter time to portable or temporary structures, such as lunch wagons, fruit stands, small real estate offices, election booths, etc., leaving the wires connected in case of vacancy as was done in this case.

About March 1, 1917, a contractor and builder named Robert Keyes took possession of the lot and commenced the erection thereon of a steel and concrete building for the Central Boiler Works. No basement was contemplated and he began work by excavating a trench for the foundation along the north side of the lot. About a week after work began he found the lunch wagon in his way and moved it back on the lot towards the alley. It was a heavy wagon and he moved it with a crew of men and team, about 40 feet back from Russell street. As this was done he had the slack in the electric wires from the pole in the alley wound up and hung over the glass insulators of the wagon, leaving them extending from the pole to the wagon sufficiently high that men and teams could pass and work under them as before. Building material, such as lumber, steel, brick, etc., was scattered over the lot and Keyes had erected a work shed on the west side of it for storage of cement, tools and other things requiring shelter. Some time before this

207—Mich.—32.

accident the coiled slack in the wires which he had hung on the insulators at the wagon had in some way gotten off and for a portion of the distance between the pole and the wagon lay on the ground, to which no attention was paid by Keyes or his employees, as the wires did not happen to be in their way and they did not know they were electrically charged. Keyes testified that he saw them lying on the ground for at least a week before the boy was killed, and there was testimony by two of deceased's playmates that these wires had lain upon the ground much longer; that after the wagon was moved back and the wires partly fallen to the ground some of the boys used to swing on them near the wagon.

At the time of the accident plaintiff's decedent, Stanley Swaczyk, was playing tag on this lot with two other boys and ran in between the work shed Keyes had built and a closeby building on the adjoining lot, belonging to the Grand Rapids Blower Pipe Company. The slacked electric wires lay along the ground at this place with what is called a "coil"; in behind the building. The boy was first seen to be in trouble by a watchman of the nearby American Car & Foundry Co., named Sackett, who had just quit for the day and was going from his work diagonally across the vacant lot. His first impression was that the boy had fallen from the building, as he saw him lying in there on some brick and cement blocks with his head back, apparently making efforts to get away. Sackett called the other boys, at the same time going around some mud and water to get nearer. He said the boy at that time "laid different ways—kind of rolled down the block," and the other boys who had come at his call dragged this boy out to him. Asked as to how the boy acted, he replied, "He looked at me and I could see he wanted to say something. I felt very sorry for him." Asked if he was then alive,

he replied, "Oh, yes," because he moved his hands, and was breathing, and spit something out of his mouth and moved his tongue. Sackett carried him to a lumber pile about 50 feet away, observed he was "in pretty bad shape" and told one of his playmates to run over to the nearby Foundry Co.'s office for help and sent the other to tell the injured boy's parents. Help not coming promptly, he himself ran to the Foundry Co.'s office and telephoned for medical aid which arrived about the time he got back to the injured boy who was yet alive, as he testified. Unsuccessful efforts were made by and under directions of the doctor to resuscitate him, in which Sackett assisted, remaining while the doctors were working over him and until he was pronounced dead, about an hour later.

At commencement of the trial counsel for defendant interposed objection to the introduction of any testimony under plaintiff's declaration on the ground that it combined two distinct causes of action in one count—under the survival act and under the death act—insisting on such objection "until counsel amends to make it one or the other." Counsel for plaintiff then amended, or elected to claim under the survival act, and the trial proceeded upon that alleged cause of action.

Recovery under the death act having thus been eliminated, counsel for defendant then contended by objection, motion and request to charge, that recovery could only be had, if at all, under the death act, asking a directed verdict for that reason, which was refused.

Defendant's most strenuous contention is that the evidence shows the boy was instantaneously killed, any subsequent manifestations of life witnesses testified to being "but spasmodic muscular movements" after life was extinct, and, viewed most favorably, the verdict was against the great weight of evidence. In his reasons for denying defendant's motion for a new

trial on that and other grounds the learned circuit judge who heard the case said:

"The evidence shows that the deceased lived something like an hour, I believe, after he had been moved from contact with the wire. If he had lived for 24 hours, no one would have dreamed of saying the cause of death was continuous, or have compared the injury in question with a death by drowning. I cannot differentiate between an hour and a day."

What testimony there is upon the subject of survival is undisputed. Defendant called no witnesses to that issue. The only medical testimony offered was that of Dr. Dick, called by plaintiff to show the cause of death. He examined the boy's body after it was taken to the morgue and held an autopsy. He merely testified that in his opinion the boy died of an electrical shock, which operated to cause death by "overstimulating." No one saw deceased when he first came in contact with the live wire, which carried 110 volts, or knew how long it operated directly upon him. The three witnesses who saw him in contact with it testify that he was then alive, making efforts to escape; that he remained alive after he was released and the admitted cause of his death had ceased to operate directly upon him, and was yet alive after he had been carried to the lumber pile and medical aid arrived. Their testimony is positive that he was not dead when released from the wire, that he sat up, endeavored to get upon his feet, looked at them and tried to talk in a manner indicating he wanted to say something, though unable to do so; the boy sent for his parents testified he was yet alive and breathing, after he returned. The testimony of the two boys while positive is perhaps least satisfactory, owing to their youth, inexperience and friendship for deceased, but Sackett had never seen the boy before, was apparently a disinterested witness, an intelligent man 43 years of age who

had actual experience and training in dealing with and observing the physical manifestation of injured persons, acquired when a non-commissioned officer in the regular army. He frankly stated that he could not say the boy ever regained consciousness, or just when he died, but was positive as to his being alive for some time after he was released from the wire, and described the various manifestations of it; said he knew he was alive after he placed him on the lumber pile because he breathed and "moved his eyes and his tongue, and moved his legs" and moved after the doctor who pronounced him yet alive got there. Asked how many times the boy tried to get on his feet or get up, he replied:

"I could not say how many times he did try. I know he was in distress and struggled as a person would in that case.

"Q. And that went on how long?

"A. It was fully an hour. It began to get dark when they pronounced him dead."

While there is some evidence from which it might be contended the boy was conscious after his release from the wires, yet conceding to the contrary, the fact that he did not regain consciousness is not a test of instantaneous death.

"There is no occasion for saying that one dies instantly because such survival is accompanied by a comatose condition, or unconsciousness, or insanity, or idiocy." *Olivier* v. *Railway Co.,* 134 Mich. 367 (3 Ann. Cas. 53).

The recognized test in this State distinguishing between the two causes of action, survival and instantaneous death, is whether the active cause of death continued to operate directly upon the injured person until life was extinct. *Ely* v. *Railway,* 162 Mich. 287. Concededly death from an electric shock is not necessarily instantaneous. Persons may and do suffer in-

juries from that source in all degrees from a temporary nervous disturbance or slight burn to permanent injury or sudden death, contingent on many conditions and particularly on the voltage or electromotive force of the current received, as reckoned in volts. In this case those service wires are stated to have carried 110 volts. In *Brabon* v. *Power Co.*, 201 Mich. 697, cited by defendant, deceased was found dead on a rainy morning yet standing in contact with the metal siding of an elevator building claimed to have become charged through faulty wiring from a primary line carrying 2,300 volts. It was evident that the cause of death continued to operate upon him until life was extinct, and until he was found dead. It was under such a state of facts this court said:

"The man was killed by a current of electricity received when he leaned against or touched the metal wall, and whether one or more minutes elapsed before life was extinct is not material."

In the more recent case of *Paperno* v. *Engineering Co.*, 202 Mich. 257, where deceased was killed while working on the track of an interurban electric line by the high tension current from a "third rail" carrying 2,400 volts and there was some evidence of his continuing to breathe for 17 or 18 minutes after being released from the current, this court held there was sufficient testimony to carry the question of survival to the jury. To a greater degree the undisputed facts disclosed by this record make a case for the jury under the survival act.

It is further contended for defendant that it was guilty of no negligence because it left the wires when the meter was removed in a safe condition and their subsequent unsafe condition with the resulting accident is attributable solely to the conduct of Keyes in moving the wagon and slacking the wires, of which defendant had no knowledge or notice and for which it

is not responsible. As the court left the case to the jury the questions involved in that proposition are in effect eliminated by the charge, which confined the issue of defendant's negligence to the one question of proper care and inspection of the wires after Keyes moved the wagon, telling the jury that there was no evidence the service wires were left by defendant in an unsafe condition, and that defendant was not bound to remove its electrical service wires from the lunch wagon when the service was discontinued to Mrs. Parsons, saying further:

"The defendant was not bound to anticipate that a third party might so move the lunch wagon as to make the service wires leading to it dangerous to the public, nor was it bound to anticipate that the lunch wagon might be moved without notice to it. * * * What the defendant was required to do in this case was, after the removal of the meter, to exercise a reasonable inspection with reference to the condition of the wires. * * * If the current is left upon them they must exercise a certain care—reasonable care in the inspection of their property to see that by the action of the elements or otherwise those wires are not broken or removed from the building, and so become a danger to the public in general. * * * The question for your determination, gentlemen of the jury, is whether these wires which had been removed by the contractor and wound in loops around the bracket had come down to the ground and remained upon the ground such a length of time that the defendant company, considering the dangerous character of such wires, ought by a reasonable degree of care to have known of its condition and remedied it. * * * If anybody is furnishing electricity as furnished by the defendant company in this case, a very high degree of care is enjoined, and I may say, gentlemen of the jury, it is perhaps the highest degree of care which is reasonably practical; not if by the expenditure of a sum which perhaps would be prohibitive a higher degree of care might be maintained, but it is perhaps as high a degree of care as is reasonably practicable under the circumstances of the case."

To the portions of the charge quoted defendant assigns error on the ground that failure to inspect is not charged in plaintiff's declaration, and a too high degree of care is imposed upon defendant by the language used. Although in alleging and arguing the duties and failures of defendant in connection with this accident, plaintiff's declaration makes a heavy draught on the vocabulary of negligence, it must be admitted that the words "inspect," or "inspection" esscaped the pleader, and in the particulars pointed out the declaration is technically defective. But under the assumption that the greater includes the less we see no reason to disturb the conclusion of the trial court in denying defendant's motion for a new trial that:

"There is enough in the declaration to warrant the submission to the jury on that issue. Certainly the counsel could in no wise have been surprised by the submission to the jury on this phase of the case."

Plaintiff alleged and claimed other grounds of negligence, including leaving the electrically charged wires attached to the wagon after service was discontinued, which the court rejected, confining the inquiry to failure of defendant to properly look after and care for its wires between the time they became in an unsafe and dangerous condition and the accident. To inspect simply meant, as applied to the issue here, to look after, pay attention to and reasonably care for these live wires running to an unused wagon on a vacant lot and see that they remained in as safe condition as when left. In *Sumner* v. *Edison Co.*, 187 Mich. 169, where failure to inspect was not technically charged, defendant assigned error on the charge of the court that "defendant would be liable, unless the defendant had duly inspected the rope and found it sound," of which this court said:

"In other words, that a recent inspection of the rope and finding it sound, if shown by defendant,

would relieve it from liability in this case. The court was not in error in so charging the jury as to inspection."

Under the declaration and facts in this case we find no reversible error in the court's charge as to inspection, which in substance narrowed the issue for the jury to the question of whether such time had elapsed since these wires fell upon the ground and became a public menace that defendant should have observed their dangerous condition and remedied it in the exercise of reasonable care and vigilance, in the conduct of its business under the circumstances shown and in view of the dangers connected with the business in which it was engaged.

Neither do we think the language of the charge imposed too high a degree of care as to the public upon those engaged in the business of handling electric currents. Counsel for defendant contends that it imposed a greater duty than the settled rule in this State by which every one in the conduct of his business, whether hazardous or otherwise, is only bound to the exercise of reasonable care under all the circumstances. Reasonable care is to be determined by, and must be commensurate with, the risk involved, within the limits of reasonable practicability under the circumstances, which is the substance of the test stated by the trial court. In *Warren* v. *Railway Co.*, 141 Mich. 298, numerous cases are cited from other States showing the trend of decisions upon this subject, and it was there said in that connection:

"We find it unnecessary to say, as some courts have said, that the use of electricity imposes the duty of the greatest possible care."

Several of the cases cited in the *Warren Case*, and others which may be found, appear to put no limit on the superlative but impose without qualification "ut-

most care," "greatest care," "constant oversight," "utmost degree of care," "highest degree of care," etc. Such is not the unlimited requirement in the language complained of, which expressly excludes an impractical, or prohibitive "utmost," or "highest degree" of care. The court said that of those engaged in the business of furnishing electricity to the public was demanded only "as high a degree of care as is reasonably practicable," or, in other words, as is consistent with the practical conduct of their business according to best known methods and usage. This court has twice said that a "very high degree of care for the protection of life" is imposed upon those engaged in that business. *Huber* v. *Electric Co.*, 168 Mich. 531; *Paperno* v. *Engineering Co.*, *supra*.

It is further urged that the case should be reversed because the verdict was against the great weight of evidence and excessive. That the case is by the evidence put on the border line between the survival act and the death act is true, and what the verdict would have been had both been submitted to the jury is highly problematical, but we cannot conclude as a matter of law that the verdict was so against the overwhelming weight of evidence as to demand invasion by this court of the province of the jury in that particular. Had recovery, however, been restricted to the death act the verdict would have been clearly excessive. In its practical aspect it may be conceded the distinction is largely technical. Conscious pain and lingering suffering of the survivor, with attendant mental and physical distress, perhaps for many years, or the balance of a probably protracted life, for which large verdicts to the actually surviving injured party have sometimes been sustained, are not involved here, and that class of cases is not applicable. There is force in the contention that under the facts and circumstances here shown the verdict is beyond the com-

monly recognized fair measure of damages and to an extent excessive.

If plaintiff concedes by remission a reduction of the verdict to $5,000 the judgment will stand affirmed with costs to defendant, otherwise the same will be reversed with costs to defendant and a new trial awarded.

BIRD, C. J., and MOORE, BROOKE, FELLOWS, STONE, and KUHN, JJ., concurred.

The late Justice OSTRANDER took no part in this decision.