CLUMFOOT *v.* ST. CLAIR TUNNEL CO.

1. NEGLIGENCE—DEFENDANT LIABLE IF PROBABLE CONSEQUENCES MIGHT HAVE BEEN FORESEEN.

In an action for personal injuries alleged to be the result of defendant's negligence, in order that the plaintiff may recover it must appear that his injury was the natural and probable consequence of a negligent act or omission of the defendant which under the circumstances an ordinarily prudent person ought reasonably to have foreseen or anticipated might possibly occur as a result of such act or omission.

2. SAME—MANNER OF INJURY NEED NOT BE FORESEEN.

It is not necessary that the manner in which a person might suffer injury should be foreseen or anticipated in specific detail in order to render one liable for negligence.

3. ELECTRICITY—NEGLIGENCE—DEFECTIVE INSULATION.

Where electric wires carrying a high voltage for the purpose of operating trains through defendant's tunnel were so imperfectly insulated that a man standing in the open doorway of a car could touch them and receive injury, it was a question for the jury as to whether defendant

On excessiveness of verdicts in actions for personal injuries other than death, see note in L. R. A. 1915F, 30.

should have foreseen or anticipated that contact would probably result, although the exposed wires were beyond the reach of a man standing on the ground.

4. SAME—NEGLIGENCE—CONTRIBUTORY NEGLIGENCE.

Where plaintiff, in the course of his employment as an expressman, in attempting to spring up into a car, lost his balance and fell backward, his hand coming in contact with the defective wiring, resulting in severe injuries to him from electric burns, it cannot be said that he was guilty of contributory negligence as a matter of law because he was familiar with the surroundings, in view of the fact that the wires were apparently insulated and therefore safe, and he had a right to presume that his employer would provide him with a safe place in which to work.

5. SAME.

Although plaintiff might have attempted to enter the car at another point where it would have been safer, his failure to do so cannot be said to be contributory negligence as a matter of law, where it cannot be said that he deliberately placed himself in a place of known or apparent danger.

6. SAME—UNUSUAL CONDITION No DEFENSE.

That an unusual condition was created by plaintiff's slipping, and that he would not have been injured if he had not slipped, does not relieve defendant from liability for its negligence in leaving the wires in a dangerous condition.

7. DAMAGES—PERMANENT INJURIES—EXCESSIVE VERDICT.

Where plaintiff, 30 years of age and earning $110 a month as an expressman at the time of the accident, was so severely burned by the electricity that he was permanently disabled thereby, his right arm being amputated just below the elbow, his feet so severely burned that they would never be normal, and there had been great pain and suffering resulting in sleeplessness and nervousness, it cannot be said that a verdict for $30,000 is excessive.

Error to St. Clair; Law (Eugene F.), J. Submitted October 18, 1922. (Docket No. 62.) Decided December 5, 1922.

Case by Herman Clumfoot against the St. Clair Tunnel Company for personal injuries. Judgment for plaintiff. Defendant brings error. Affirmed.

*Phillips & Jenks,* for appellant.

*Walsh & Walsh,* for appellee.

SHARPE, J. The tunnel under the river at Port Huron is owned by the defendant company. The trains of the Grand Trunk Railway Company are operated through it by electricity installed and maintained by defendant on bridges supported by piers. At certain points the electric wires are carried from the bridges to boxes attached to the side of the piers about 9 feet from the ground for convenience in shutting off the current between points for repairs. The plaintiff, on May 22, 1920, was in the employ of the American Railway Express Company. He and two helpers were engaged in transferring the express from a Pennsylvania car standing on a siding in the yard at the entrance to the tunnel to another express car. They had loaded a hand express wagon and placed its contents in the car. They loaded again and, as they stopped at the door of the express car, the plaintiff attempted to get in by placing one of his feet on the rods below and his hands on the side and floor of the car. As he sprang up, he lost his balance, threw out his hands, and the right one came in contact with the electric wires running to a box on the pier near the door of the car. The express car was made of metal. The wire carried 3,300 volts. Plaintiff received very severe injuries. He brought suit against the express company, the railroad company and the appellant. Verdict was directed and judgment entered in favor of the two first named. There was a verdict for $38,950 against appellant, hereafter called defendant. Its motion for a new trial was

denied on plaintiff's remitting $8,950. The judgment entered for $30,000 is reviewed by writ of error. The assignments will be considered in the order discussed by counsel.

1. Was the defendant guilty of negligence? We have on several occasions pointed out the dangers incident to the use of electric wires carrying a high voltage and the care which must be exercised for the protection of persons likely to come in contact with them. *Huber* v. *Electric Co.*, 168 Mich. 531; *Paperno* v. *Engineering Co.*, 202 Mich. 257; *Swaczyk* v. *Detroit Edison Co.*, 207 Mich. 494. See, also, 20 C. J. p. 341. In order that the plaintiff may recover it must appear that his injury was the natural and probable consequence of a negligent act or omission of the defendant which under the circumstances an ordinarily prudent person ought reasonably to have foreseen or anticipated might possibly occur as a result of such act or omission. *Baker* v. *Railroad Co.*, 169 Mich. 609; *Morrison* v. *City of Ironwood*, 189 Mich. 117. The negligence charged is the failure of the defendant to have the wires with which plaintiff came in contact properly insulated. That they were not, on the day plaintiff received his injuries, clearly appears. When installed, they were protected by a covering of split rubber hose wound with tape for a distance of 5 feet above the box. One of defendant's linemen, engaged in general maintenance and repair work, called by plaintiff, testified that he examined the insulation soon after plaintiff's injury and found that "the hose was in rather deteriorated condition, or, in other words, the water had affected it or had rotted the hose." He further testified that he "would not regard that as reasonable safe insulation for men working around it."

Defendant's counsel contend that in view of the location of the wires, beyond the reach of a man stand-

ing on the ground, no such duty devolved on it.   The test to be applied is, Was there a likelihood or reasonable probability of human contact with the wires by persons who had a right to be in a place from which such contact was possible?   If so, the danger should have been foreseen or anticipated by the defendant. 20 C. J. pp. 354, 355; *Brown* v. *Illuminating Co.*, 46 L. R. A. 745 (90 Md. 400, 45 Atl. 182, 78 Am. St. Rep. 442).   It is not necessary that the manner in which a person might suffer injury should be foreseen or anticipated in specific detail.   The side track was constructed for the purpose of receiving and discharging cars.   It had been used on many occasions for the transfer of express from car to car.   There was nothing to warn train crews placing such cars of the danger of leaving them near one of the piers.   The wire was in a position where it could be touched by the hand of a man standing in the open doorway in the side of a car.   Of these facts the defendant had, or was chargeable with, notice.   The care to be observed by it must be in proportion to the danger involved and extends to every place where persons have a right to be, whether for business, convenience or pleasure.   In our opinion it was for the jury to say whether an ordinarily prudent person, installing or maintaining such high voltage wires so close to the track where men were engaged in the work being performed by plaintiff, should not have foreseen or anticipated that contact with such wires would probably result.   See *Jaworski* v. *Detroit Edison Co.*, 210 Mich. 317, and cases cited, and *Ignaszak* v. *Refrigerator Co.*, *ante*, 10, where many authorities are cited and quoted from.

2. Was plaintiff guilty of contributory negligence? Notices with the words "Danger—High Voltage," printed in large type, were placed on several of the piers.   There was one on that to which the wires

were attached, from which plaintiff received his injury.    Counsel's claim is thus stated:

"He saw the wire, knew its closeness to the door, knew its dangerous character and with his eyes wide open to the danger undertook to climb into the car at the point nearest the wire, and at such a position that a slip or fall would bring him in contact with it."

The plaintiff was undoubtedly familiar with the surroundings.    He testified that while he had observed the box attached to the pier he did not know "what it was for."    We cannot say as a matter of law that he was charged with the duty of ascertaining its purpose.    He had a right to assume that his employer would provide him with a safe place in which to work, that if a danger, not apparent by such observation as the notices required of him, was present, he would be warned of it.    Besides, the wires were insulated, thereby affording an apparent protection against contact with them.    In *Teachout* v. *Railway Co.*, 179 Mich. 388, this court quoted approvingly the following from 15 Cyc. p. 475:

"As in other cases of negligence, contributory negligence on the part of plaintiff, in an action for injury done by electricity, precludes a recovery.    Thus one who has notice of the dangerous condition of a wire or other electrical appliance, and voluntarily brings himself into contact with it, cannot hold the company for the resulting injuries.    To give rise to this defense, however, it must be shown that plaintiff, in coming in contact with the appliances, voluntarily and unnecessarily exposed himself to danger, and if reasonable men might honestly differ on the question, the court will not hold plaintiff guilty of contributory negligence as a matter of law."

Other citations and quotations from this opinion will be found instructive.    It must also be borne in mind that the act of the plaintiff in throwing out his hand when it came in contact with the wire was not

deliberate.   He acted in the emergency created by losing his balance after he reached the floor of the car.   The elements of heedlessness or voluntary exposure to a danger or lack of proper precaution for his own safety were therefore absent.   It is said that he might have entered the car door at a point farther removed from the pier and the wires.   We cannot say that in making the attempt he deliberately placed himself in a place of known or apparent danger.   As was said in *Hazzard* v. *Consolidated Coal Co.*, 183 Mich. 363, 367:

"His conduct on that occasion, with all the attendant circumstances, must be referred to the usual test, namely, whether he did that thing which the ordinarily prudent and careful man would have done under similar circumstances."

We find no error in the refusal to direct a verdict for this reason.

3. Proximate Cause.   Counsel claim that "the accidental slipping of his foot and losing his balance" on the part of plaintiff was the proximate cause of his injury.   It is true that had he not slipped he would not have been injured.   The manner in which he sought to get into the car was not unusual.   It is a matter of common knowledge that trainmen and others having occasion to enter a car with a side entrance frequently do so in that way.   The fact that an unusual condition was created by plaintiff's slipping does not relieve the defendant if it had negligently placed so dangerous an instrumentality as insufficiently protected electric wires carrying a high voltage where, in case an unusual thing happened to plaintiff, he would be injured thereby.   In *MacDonald* v. *Freeman Manfg. Co.*, 160 Mich. 380, a similar claim was made. It was said (p. 385):

"It would be a technical application of the rule in this case to say that inasmuch as the slipping upon

the blocks caused plaintiff to come in contact with the bolt which caused the overalls to be caught, which resulted in his being drawn over the shaft and the consequent breaking of his members, the slipping of the blocks was the only proximate cause. The rule of proximate cause has a place in actions for negligence. It is perhaps true that there is some want of harmony in the cases, as to the rule itself, but more particularly as to its application. We are of the opinion that this case is well within the rule."

Many cases are there cited which sustain the holding. Defendant relies on our recent case of *Horn* v. *Parke, Davis & Co.*, 215 Mich. 578, and the authorities there cited and quoted from. In that case it was said (p. 581):

"If the injury is the result of a mishap, an accident pure and simple, and there is no negligence of the master which constitutes the proximate cause of the injury, there can be no recovery against him."

The distinction is apparent.

4. Excessive Verdict. As a result of the injury, plaintiff's right hand and arm and the soles of both feet were very badly burned. Three of the fingers "were completely burned through, being held in place by a charred fragment of bone." These fingers were amputated the third day after his injury. About the 10th day, the hand was taken off at the wrist. About a month later, the arm was amputated just below the elbow. The trial was had about 20 months after plaintiff was injured. Dr. Kesl testified:

"His feet were badly burned, both feet being what we call third degree injuries—that is the burn extended through the skin and through the pad on the feet lying underneath the skin and into the muscles of the soles of the feet and in one case there was an exposure of bone. He was in the hospital close to 90 days and I made a daily dressing of both his arm and feet. The dressing of the feet was the more difficult because it caused considerable pain to the

patient, especially in trimming off the dead cuticle that separated from the live tissues beneath, which came off, I imagine, until about September 1st. That is, there was some taken off every day. There was more or less trimming until the tissues became healthy and commenced to grow back and heal which was about three months after the injury. We did that practically every day. Not only was it necessary to trim skin away but there were two small pieces of bone that were cast off, I think, from the left foot back of the large toe. I would say that the pain became greater in proportion according to the length of time beyond the injury; that is, as the tissues regained a certain normal tone the nerves become more sensitive and towards the last I imagine there would be a greater degree of pain although there was pain all the time. I am still dressing the feet. One of the feet needs dressing frequently even now. I would say from two-thirds to three-quarters of the skin was lost at that time. The skin will never be replaced as a tissue. The healing takes place by the formation of scar tissue which fills in and later contracts. Such scar tissue does not contain the usual nerve endings that are found in healthy skin and the blood supply of such tissue is not equivalent to the supply in normal tissue. * * * That leaves the feet in a very sensitive condition to standing or walking or running, in fact such tissue could not successfully bear the weight of the body for any length of time without becoming tender and would be very, very sensitive to either heat or cold—a hot summer day or a cold winter day. There is no remedy for a scar in that position. There is a lack of elasticity in the movements; normally a normal foot is elastic in walking or running. In this injury we find that the deeper tissues have been involved, and particularly in the left foot, destroyed. There is a stiffness of motion in the foot and in some of the tarsal and metatarsal joints the motion is entirely lost. That is particularly noted on the left foot in the joints that extend backward from the great toe, but I believe it is present in all of the joints, all of the metatarsal joints and tarsal joints in that foot and to a lesser degree on the opposite side in the right foot. As to

the one big toe, there is a complete ankylosis, causing a complete fixing of the joint, which has been practically obliterated.   The tarsal joint would be up between the bones that form practically the ankle and have been lost to a greater or less extent, and I don't believe the motion in those joints will ever come back.   I can't see how it can.   The elasticity of the feet is necessary to normal walking, running or jumping."

Dr. McKenzie gave testimony of similar import. Plaintiff was 30 years of age at the time of his injury. He was earning $110 per month.   That his sufferings were intense and that he is permanently disabled admit of no doubt.   He testified:

"The elbow was burned right in the joint.   That pain spot extends around inside at the bend of the elbow.   It is very sensitive.   My arm is too tender to get an artificial arm, and there is a large scar there and it hurts to touch it.   *   *   *   Both cold and hot weather affect my feet.   They get cold very quickly which causes pains and aches and in hot weather it causes a burning feeling.   As a result of the accident I am very nervous.   I cannot sleep at nights.   I roll around until two or three o'clock in the morning and my feet are just like they try to get away from me.   I have no control of them, and I cannot sit down for any length of time.   I get fidgety and jump around, and I have to get up and move around a little.   This continues up to the present time.   This fidgety condition interferes with my sitting down and doing work.   I cannot get my mind on anything I have tried.   I have often sat down and tried to write or read a story but it is impossible.   I get fidgety and jump around.   I have to get up and move around, which relieves it a little.   *   *   *   My weight before the accident was one hundred fifty-four pounds, I now weigh one hundred thirty."

In the recent case of *Fishleigh* v. *Railway*, 205 Mich. 145, the question of excessive verdict for damages arising out of personal injuries was considered at length.   We do not think anything can be added to the

reasoning of the present Chief Justice in that case. The amounts of the verdicts in many cases in this and other courts, where the sufferings and permanent disability resulting from the injury are more or less similar to that before us, are stated and commented on.    After thoughtful consideration, we can but reach the conclusion there stated:

"Considering this record, the findings of the trial judge, the decisions of this and courts of last resort of our sister States, we are not persuaded that we should disturb this judgment." .

The judgment is affirmed.

FELLOWS, C. J., and WIEST, MCDONALD, CLARK, BIRD, and STEERE, JJ., concurred.    MOORE, J., did not sit.