*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

SHEILA ANN ROKOSZ,

      Plaintiff-Appellant,

v

DEREK JOSEPH LABEAN, DONALD LABEAN,
and DAWN LABEAN,

      Defendants-Appellees.

UNPUBLISHED
August 19, 2021

No. 353043
Bay Circuit Court
LC No. 19-003177-NI

Before: MARKEY, P.J., and SHAPIRO and GADOLA, JJ.

PER CURIAM.

In this third-party tort action, plaintiff appeals by right the trial court's order granting defendants summary disposition under MCR 2.116(C)(10) (no genuine issue of material fact). We conclude that there are material questions of fact regarding causation, the nature and extent of plaintiff's injuries, and whether the three serious-impairment prongs are met in this case. Accordingly, we reverse the trial court and remand for further proceedings.

## I. BACKGROUND

The motor vehicle accident occurred on August 4, 2017. As plaintiff was passing through an intersection going 45 to 50 mph, Derek Labean's vehicle struck the rear driver side of plaintiff's vehicle, causing her vehicle to overturn multiple times and land upside down in a ditch. Plaintiff was able to extricate herself from her vehicle. She testified at her deposition that multiple body parts, including her head, neck, and knee hit the inside of her vehicle during the accident. She also testified that her knee struck the console when she unbuckled herself to get out of the upside-down vehicle.

Plaintiff filed suit against Derek and the owners of the vehicle, Donald and Dawn LaBean. After discovery defendants moved for summary disposition on two theories. First, that the evidence failed to create a question of fact whether plaintiff's bodily impairments were caused or, if preexisting, aggravated by the accident. Second, that if any of her bodily impairments were caused or exacerbated by the accident, plaintiff had failed to provide evidence so as to create a question of fact whether the injuries resulted in a serious impairment of a body function. The trial

-1-

court found that there was an objective finding only to plaintiff's vision impairment, and that there was no indication that this impairment affected plaintiff's general ability to lead her normal life. As to the other claimed impairments, the court found that plaintiff's subjective complaints were not supported by objective testing. The court did not address causation.[1]

## II. ANALYSIS

Under the no-fault act, MCL 500.3101 *et seq.*, tort liability is limited. *Patrick v Turkelson*, 322 Mich App 595, 606; 913 NW2d 369 (2018). "A person remains subject to tort liability for noneconomic loss . . . only if the injured person has suffered . . . [a] serious impairment of body function . . . ." MCL 500.3135(1). As an initial matter, we must address whether there is a question of fact on causation as this is defendants' primary argument and potentially dispositive.

## A. CAUSATION

"To establish a prima facie case of negligence, a plaintiff must prove four elements: (1) a duty owed by the defendant to the plaintiff, (2) a breach of that duty, (3) causation, and (4) damages." *Cawood v Rainbow Rehab Ctrs, Inc*, 269 Mich App 116, 121; 711 NW2d 754 (2005) (quotation marks and citation omitted). Causation is comprised of factual causation and legal causation, also known as proximate cause. *Ray v Swager*, 501 Mich 52, 64; 903 NW2d 366 (2017). Factual causation means that "the defendant's conduct in fact caused harm to the plaintiff," while legal causation requires that "the harm caused to the plaintiff was the general kind of harm the defendant negligently risked." *Id*. (quotation marks and citations omitted).

Causation is an issue that is typically reserved for the trier of fact unless there is no dispute of material fact. *Holton v A+ Ins Assoc, Inc*, 255 Mich App 318, 326; 661 NWd 248 (2003). "[A] plaintiff's evidence of causation is sufficient at the summary disposition stage to create a question of fact for the jury if it establishes a logical sequence of cause and effect, notwithstanding the existence of other plausible theories, although other plausible theories may also have evidentiary support." *Patrick*, 322 Mich App at 617. *Patrick* went on to explain:

"The general rule, expressed in terms of damages, and long followed in this State, is that in a tort action, the tort-feasor is liable for all injuries resulting directly from his wrongful act, whether foreseeable or not, provided the damages are the legal and natural consequences of the wrongful act, and are such as, according to common experience and the usual course of events, might reasonably have been

---

[1] A trial court's decision to grant summary disposition is reviewed de novo. *Pace v Edel-Harrelson*, 499 Mich 1, 5; 878 NW2d 784 (2016). "In reviewing a motion under MCR 2.116(C)(10), this Court considers the pleadings, admissions, affidavits, and other relevant documentary evidence of record in the light most favorable to the nonmoving party to determine whether any genuine issue of material fact exists to warrant a trial." *Walsh v Taylor*, 263 Mich App 618, 621; 689 NW2d 506 (2004). "A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ." *West v Gen Motors Corp*, 469 Mich 177, 183; 665 NW2d 468 (2003).

anticipated." *Sutter v Biggs*, 377 Mich 80, 86; 139 NW2d 684 (1966). When judging the foreseeability of a risk of harm, "[i]t is not necessary that the manner in which a person might suffer injury should be foreseen or anticipated in specific detail." *Clumfoot v St Clair Tunnel Co*, 221 Mich 113, 117; 190 NW 759 (1922). In other words, "[w]here an act is negligent, to render it the proximate cause, it is not necessary that the one committing it might have foreseen the particular consequence or injury, or the particular manner in which it occurred, if by the exercise of reasonable care it might have been anticipated that some injury might occur." *Baker v Mich Central R Co*, 169 Mich 609, 618-619; 135 NW 937 (1912) (opinion by MCALVAY, J.).

## 1. RIGHT KNEE[2]

Plaintiff had difficulty with her right knee before the accident. In February 2013, she had surgery to repair a torn meniscus on the knee. In 2015, she was diagnosed with degenerative joint disease in the knee with synovial joint swelling and was given a steroid injection into the joint. By September 2015, she reported 10/10 pain in the knee and, given the increasing symptoms, her doctor recommended knee replacement surgery, which was performed in November 2015. As of May 27, 2016, plaintiff reported to Dr. Bortel that "her function is still coming along quite well." On examination, Dr. Bortel found some crepitus on the lateral aspect of the knee. He recommended continuing with her home exercise program and that if it did not improve he would consider another injection or possibly "a knee arthroscopy with a debridement."

Plaintiff did not return to Dr. Bortel for over a year; her next visit to his office came after the August 4, 2017 accident. On August 29, 2017, plaintiff told Dr. Bortel that she developed pain in her right knee following the accident and that her knee felt "more rattly." Dr. Bortel noted that that prior to this plaintiff's knee "overall [had] been coming along quite well." Dr. Bortel did not "see any radiographic or physical findings that would be alarming from an orthopedic standpoint." He prescribed physical therapy.

At physical therapy, plaintiff reported pain in her right knee when using stairs, squatting and walking longer distances. At her initial evaluation, the therapist noted "poor patella tracking" and a right-sided "limping gait." After 10 visits, plaintiff reported decreased pain but complaints of "increased tightness/pulling sensation on lateral aspect" of her right knee.

Plaintiff's knee pain persisted, and in March 2018 she was referred by her primary care physician to Dr. Terrence Cherwin, D.O., of Bay City Orthopedic Surgery for an evaluation. An x-ray of plaintiff's right knee proved unremarkable, and she elected to receive a cortisone shot. Plaintiff returned to Dr. Cherwin about a month later, reporting that her pain had continued to worsen. Dr. Cherwin observed that the knee was swollen and scheduled a bone scan to rule out a loosening of the right knee prosthesis. The scan showed no evidence of "mechanical loosening of the knee or other collocating process." Nevertheless, given the swelling and pain, Dr. Cherwin

---

[2] Plaintiff alleged other injuries in her complaint, but on appeal she limits her claim to her knee, cervical spine, and vision. We will address only those injuries discussed on appeal.

recommended an arthroscopy in order to more directly visualize the joint. The arthroscopy was performed on June 1, 2018, and revealed "[s]ynovitis[3] with possible loose prosthesis of the right knee." On October 23, 2018, plaintiff underwent arthoscopic surgery during which the inflamed synovium was removed and a portion of her right knee replacement was replaced, specifically the polyethylene tibial component. She was directed to "avoid twisting and side-to-side motion of the knee." As will be discussed, plaintiff has continued to experience knee pain and limitations.

Viewing the evidence in a light most favorable to plaintiff, we conclude there is question of fact whether the knee difficulties she experienced following the accident and the loosening of the tibial component in her knee replacement were caused by the August 4, 2017 accident. The surgeon who performed plaintiff's knee replacement in 2015 reported that plaintiff's knee had been doing well prior to the accident. Plaintiff testified that she reinjured her knee when she unbuckled herself while upside down and her knee struck the console. The postaccident records indicate that she then developed, and consistently reported, knee pain. Circumstantial evidence may be relied on to establish causation. See e.g., *Genna v Jackson*, 286 Mich App 413, 417-418; 781 NW2d 124 (2009). Taken together, the lack of plaintiff's knee complaints before the accident, her testimony that she hit her knee on the vehicle console, the physical therapy findings and the surgical findings allow for a reasonable inference that her knee complaints and subsequent surgery were caused, in whole or in part, by the accident. Defendants' retained expert opined that the accident did not cause plaintiff's "right knee polyethylene exchange," however, he did not offer any support for that conclusion. Rather, he noted that "it is extremely unusual for the locking mechanism on the prosthesis to fail," which would seem to support plaintiff's claim that the failure was traumatically caused. In any event, the retained expert's opinion merely creates a question of fact for trial.

## 2. CERVICAL SPINE

In 2014, medical imaging of plaintiff's cervical spine showed "[m]arked degenerative change at C4-5 with bilateral neural foraminal narrowing and loss of disk height and endplate spondylosis." Plaintiff testified that at the time of the accident she did not have neck pain and was not treating for any neck issues.

Following the accident, plaintiff was transported to the emergency room, where she complained of neck pain and right-hip pain. A physical exam of plaintiff's neck showed spasms and tenderness. The CT scan of plaintiff's cervical spine showed "degenerative disc disease and endplate spondylosis . . . at the C4-C5 level"; there was no evidence of "acute facture or subluxation." An x-ray of plaintiff's pelvic area was also negative for acute fracture or dislocation. Plaintiff was diagnosed with a cervical strain and discharged in stable condition.

Plaintiff was seen two weeks later by her primary care physician (PCP), Dr. Timothy Kosinski, M.D., on August 30, 2017, complaining of lower back and neck pain. The physician's assistant (PA), Karen McHenry, examined plaintiff and found that she "has a lot of tightness over the bilateral trapezius and upper back, between the shoulder blades," but that her range of motion

---

[3] Synovitis is "[i]nflammation of a synovial membrane, especially that of a joint; in general, when unqualified, the same as arthritis." *Stedman's Medical Dictionary* (26th ed).

seemed normal. The PA's assessment was "upper cervical strain and spasming. She also has lower lumbar back strain and spasming, probably secondary to the accident." The PA noted that plaintiff "has a known history of cervical disk disease and I certainly think this may have been aggravated a little bit."

Plaintiff was prescribed physical therapy. Her first session for her neck was on September 12, 2017. The therapist noted severe localized pain and tenderness over the cervical spine with muscles spasms. Plaintiff reported that her neck was "always achy or burning," and at her next visit that she experiences numbness in her arms and hands.

Plaintiff returned to her PCP on October 4, 2017, and reported that she was doing "40% better." On examination, the PA found: "Cervical range of motion has good forward flexion, neck extension, lateral flexion bilaterally. Does still have a little bit of tightness over the trapezius, right greater than left to palpation." The plan was for plaintiff to continue physical therapy.

Plaintiff's neck pain continued, however, and so in April 2018 her PCP referred her to the Pain Management Center, where she was treated by Dr. Sam Morkos, M.D. Dr. Morkos noted plaintiff's report of "chronic neck pain" since the motor vehicle accident with exacerbation when reaching, bending or turning her head. On physical exam, he noted limited range of motion of the neck with sidebending, flexion and extension, a positive Spurling test[4] but no spasm. He performed a diagnostic nerve block at C3-4, C4-5, C5-6. Plaintiff testified that she has received several nerve block injections in her neck to reduce her pain.

There is no dispute that plaintiff had disc degeneration at the C4-C5 level before the accident. However, we find no significant complaints of preaccident neck pain or limitations until after the accident. Accepting plaintiff's testimony as true and after reviewing the preaccident medical records in the light most favorable to her, as we must at the summary-disposition stage, we conclude there is evidence to support her assertion that she was not suffering from significant neck symptoms before the accident. By the same token, we conclude there is evidence to support plaintiff's claim that she consistently reported pain and sought treatment following the accident. In addition, both the ER doctor and her PCP noted the presence of spasm and suggested that the accident may have aggravated her cervical disk condition. Accordingly, there is a question of fact whether the motor vehicle accident caused plaintiff's claimed neck impairment.

### 3. VISION

Plaintiff reported "constant floaters with occasionally flashes of light" following the accident. She was referred to a specialist, Dr. James Jackson, M.D., who diagnosed her with "posterior vitreous detachment" of the eye, "likely due to blunt head trauma of MVA." This diagnosis is plainly sufficient to create a material question of fact on causation of plaintiff's vision condition.

### B. NATURE AND EXTENT OF THE INJURIES

---

[4] In the Spurling test, the doctor tilts the patient's head and presses on the top. The test is positive if it creates radiating pain into the arms.

Whether a serious impairment has occurred is a question of law for the court in either of two circumstances. First, if "there is no factual dispute concerning the nature and extent of the person's injuries." MCL 500.3135(2)(a)(*i*). Second, if such a factual dispute "is not material to the determination whether the person has suffered a serious impairment of body function." MCL 500.3135(2)(a)(*ii*). "When there is a genuine issue of material fact regarding the nature and extent of a person's injuries, the threshold question of whether there was a serious impairment of body function is for the jury and may not be decided as a matter of law." *Patrick*, 322 Mich App at 608.

Defendants argue that they are not disputing the nature and extent of plaintiff's injuries and so the question whether plaintiff suffered a serious impairment is one for the court, not the factfinder. We disagree. As just discussed, defendants vigorously argue that there were no significant injuries to plaintiff's knee or cervical spine. Indeed, defendants rely on the report of their retained expert who concluded that plaintiff did not suffer any significant injuries in the crash. Plaintiff, on the other hand, claims she did suffer significant injuries and aggravation of preexisting conditions from the accident. In response, defendants argue that the postaccident medical imaging mirrors the preaccident imaging, i.e., they dispute that plaintiff's conditions have actually worsened. Thus, the parties clearly dispute the nature and extent of injuries suffered by plaintiff due to the actions of defendant driver. Further, the nature and extent of plaintiff's injuries are material to the determination whether she has suffered a serious impairment of a body function.

Defendants argue that plaintiff has only shown injuries, not an impairment, i.e., that even if she was injured in some fashion, those injuries did not result in an impairment of any body function. However, that is essentially an argument regarding the extent of plaintiff's injuries, i.e., to what degree did the injuries impair a body function.

## C. SERIOUS IMPAIRMENT

Because defendant contests the nature and extent of the injuries, the question whether plaintiff has suffered a serious impairment of a body function is one to be made by the factfinder. The court may dispose of the question as a matter of law only where there is no question of material fact. MCR 2.116(C)(10).

MCL 500.3135 provides three prongs that plaintiff must establish to show a serious impairment of body function: "(1) an objectively manifested impairment (2) of an important body function that (3) affects the person's general ability to lead his or her normal life." *McCormick v Carrier*, 487 Mich 180, 195; 795 NW2d 517 (2010). As *McCormick* explains, an objectively manifested impairment for purposes of MCL 500.3135 is an impairment that is evidenced by actual symptoms or conditions that someone other than the injured person would observe or perceive as impairing a body function.[5] *Id*. at 196. Impairment means the state of (1) "being weakened, diminished, or damaged" or (2) "functioning poorly or inadequately." *Patrick*, 322 Mich App at 608 (quotation marks and citation omitted). Thus, if there is objective evidence of a reduced or

---

[5] MCL 500.3135 was amended by 2019 PA 21, effective June 11, 2019. Because this case was filed before the date the amendment became effective, the prior version of the statute controls. See *George v Allstate Ins Co*, 329 Mich App 448, 451 n 3; 942 NW2d 628 (2019).

inadequate body function that has been weakened, diminished or damaged, a question of fact is present.

As found by the trial court, there was an objective basis for plaintiff's claimed vision impairment resulting from the accident given the specialist's diagnosis that she suffered a "posterior vitreous detachment" of the eye. And the "constant floaters" reported by plaintiff qualifies as an impairment, i.e., the state of functioning poorly or inadequately. *Patrick*, 322 Mich App at 606-607.

There was also an objective basis for plaintiff's complaints of knee pain and limitations. While medical imaging did not provide an objective basis for the complaints, a scope in June 2018 revealed a possible loose prosthesis of the right knee, and in October 2018 plaintiff had surgery to replace a loose polyethylene tibial component of her right knee. Thus, even though imaging of plaintiff's knee was negative, the doctor's direct observations during surgery in which he actually saw the pathology is a sufficient, if not superior, form of objective evidence. And a loose tibial component necessitating surgery and replacement was clearly an impairment, i.e., plaintiff's knee was weakened, diminished, or damaged. *Id*. at 607. Accordingly, the trial court erred by concluding that there were no objective findings supporting plaintiff's reports of knee pain following the accident.

As to her neck and upper back, there was no medical imaging showing that plaintiff suffered a traumatic injury from the accident. However, it is well established that "the aggravation or triggering of a preexisting condition can constitute a compensable injury." *Fisher v Blankenship*, 286 Mich App 54, 63; 777 NW2d 469 (2009). And the physical exams at the emergency room and later by her treating physicians were consistent with aggravation or increased symptoms from plaintiff's preexisting cervical disk degeneration. At the emergency room the day of the accident, plaintiff was observed to have "bilateral paracervical spasming." On a visit to her primary care physician on August 30, 2017, the PA found on exam that plaintiff had tightness over her upper back and upper cervical strain and spasming. We have held that muscle spasms are objective manifestations of an injury. *Franz v Woods*, 145 Mich App 169, 176; 377 NW2d 373 (1985). Further, Dr. Morkos observed limited range of motion of plaintiff's cervical spine in all directions as well as a positive Spurling test. A limited range of motion is an objectively manifested impairment. See *McCormick*, 487 Mich at 218. Thus, there were physical findings to support plaintiff's subjective complaints of pain.

In sum, there was evidence—at least enough to establish a question of fact—of an objectively manifested impairment as to plaintiff's vision, her knee and her neck.

Because defendants do not dispute that the neck, upper back, knee and vision are important body functions, the next question is whether the impairments affected plaintiff's general ability to lead a normal life. *Id*. at 200. The impairment must have "an influence on some of the person's capacity to live in his or her normal manner of living." *Id*. at 202. To determine whether a person's general ability to lead his or her normal life has been affected, "a comparison of the plaintiff's life before and after the incident" is required. *Id*. As noted, because defendants dispute the nature and extent of plaintiff's injuries, plaintiff must present evidence that creates a question of material fact.

We find no evidence that the injury to her eye has affected plaintiff's general ability to lead her normal life. She does not describe any changes to her normal life that were caused by seeing "floaters."

On the other hand, she has described changes to her life as a result of her knee and cervical spine injuries. Although the record contains a 2014 x-ray of her cervical spine, it does not explain why the study was performed and the medical records provided by the parties do not describe any cervical spine treatment before the accident.[6] In her July 2019 deposition, plaintiff testified that she was "more active before the accident and without . . . pain. It takes effort, and I've learned to do things differently since the accident." She described her preaccident life style. She explained that she retired in 2011, maintained her own home, gardened and regularly worked out at a gym three to four times per week. She testified that she did not have trouble walking following recovery from her 2015 surgery until the accident after which walking became difficult. She had to "redirect[] the way I carr[y] myself" and sometimes used a cane, until the revision of her knee replacement in 2019. She testified that getting dressed is more difficult because her right knee motion is limited. She also testified that her ability to garden is now limited to "deadheading" her flowers and "pull[ing] a couple of weeds. She testified that: "I still like to go out there, but I pay for it afterwards." She could no longer mow the lawn with her push mower and so purchased a self-propelled lawn mower. She now mostly eats on paper plates to avoid having to do the dishes. And she now goes to the gym about once every two weeks rather than three of four times per week. She also testified that because of neck pain she has to limit her time reading.

Plaintiff also testified that following the accident her life became centered around medical treatment and appointments. She testified that she was not doing any physical therapy prior to the accident, and that she attended 109 physical therapy appointments postaccident from September 2017 through December 2018 and that she had to resume physical therapy in April 2019 due to pain because she could not receive another cervical nerve block until December 2019. In addition to the cervical spine treatment, she has undergone two surgical procedures on her right knee.

Plaintiff's proofs regarding the disruptions and changes to her "normal life" are not overwhelming, but they are sufficient to create a question of fact. "The statute merely requires that a person's general ability to lead his or her normal life has been *affected*, not destroyed." *McCormick*, 487 Mich at 200. See also *Piccione v Gillette*, 327 Mich App 16; 932 NW2d 197 (2019) ("The statute only requires that some of the person's *ability* to live in his or her normal manner of living has been affected, not that some of the person's normal manner of living has itself been affected.") (quotation marks and citation omitted). Thus, we must consider "not only whether the impairment has led the person to completely cease a pre-incident activity or lifestyle element, but also whether, although a person is able to lead his or her pre-incident normal life, the person's general ability to do so was nonetheless affected." *McCormick*, 487 Mich at 200. Given the records and her testimony, we conclude there is a question of fact whether plaintiff's general ability to lead her normal life has been affected by the injuries incurred in the motor vehicle accident. At

---

[6] The only other reference to neck problems in the pre-accident records provided by the parties, other than the CT scan, is a single complaint of neck pain on an intake form she completed in September 2007.

her deposition in July 2019, almost two years after the accident, plaintiff testified that the injuries still limited her function and activities. There is no temporal requirement for how long an impairment must last, but time is a relevant factor. See *id.* at 203. That plaintiff's impairments had been ongoing for a substantial period of time supports the conclusion that reasonable minds could differ whether her impairments have affected her general ability to lead her normal life.

## III. CONCLUSION

There are material questions of fact on causation and the nature and extent of plaintiff's injuries. Further, reasonable minds could differ whether she suffered a serious impairment of body function as defined by MCL 500.3135. Accordingly, the trial court erred by granting summary disposition to defendants under MCR 2.116(C)(10).

Reversed and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Jane E. Markey
/s/ Douglas B. Shapiro
/s/ Michael F. Gadola