ELBERT v. CITY OF SAGINAW.

NEGLIGENCE—INSTRUCTIONS — MUNICIPAL CORPORATIONS — EXCAVA-
TIONS—BARRICADES—INFANTS—PARENTAL FAULT.

New trial is granted to child 2 years and 8 months of age
in his action against city and water main contractor for
permanent brain damage received when he fell into 28-day-
old, 4' x 4' x 16' partially barricaded excavation, in city street
in front of his home, that had been water-filled for several
days, for failure to determine and charge jury properly as to
duty of defendants, owed to children of such age, in bar-
ricading excavation for their protection, there being no derelic-
tion in parental care of, or obligation to, the child, per SMITH,
EDWARDS, KAVANAGH, and SOURIS, JJ., and for studied injec-
tion into such child's case of the subject of parental fault,
contributory or otherwise, per BLACK, J.

DETHMERS, C. J., and CARR and KELLY, JJ., dissenting.

Appeal from Saginaw; Huff (Eugene Snow), J.
Submitted October 4, 1960. (Docket No. 11, Calen-
dar No. 48,100). Decided June 29, 1961. Rehearing
denied September 21, 1961.

Case by Roland W. Elbert, guardian of the estate
of James Roland Elbert, a minor, against the City
of Saginaw, a municipal corporation, and Eugene J.
Fattore and Stephen J. Fattore, copartners doing
business as Fattore Company, for damages sustained
when minor fell into a street excavation. Verdict
and judgment for defendants. Plaintiff appeals. Re-
versed and new trial granted.

*van Benschoten & van Benschoten,* for plaintiff.

REFERENCES FOR POINTS IN HEADNOTES
39 Am Jur, New Trial §§ 113, 119.

*W. Vincent Nash,* City Attorney (*William A. Boos, Jr.,* of counsel), for defendant City of Saginaw.

*Stanton & MacKenzie* (*Stanton, Taylor & McGraw,* on application for rehearing), for defendant Fattore Company.

DETHMERS, C. J. (*dissenting*). Plaintiff's ward, his son, while 2 years and 8 months of age, fell into a water-filled street excavation 4 feet deep, 4 feet wide, and 16 feet long, sustaining personal injuries. Defendant Fattore Company had made and maintained the excavation under a contract with defendant city to lay water mains. Suit is for damages resulting from the injuries. The jury returned a verdict of no cause for action. From an order denying plaintiff's motion for new trial he appeals.

The excavation was near an intersection in the street and 12 feet from the nearest point in the sidewalk. It was across the street and a couple of houses removed from plaintiff's residence. It was surrounded by a long, sawhorse-type of wooden barrier on the street side; on the opposite side, between it and the sidewalk, by the pile of dirt, higher than the wooden barrier, which had been removed from the excavation, and at each end by boards laid across from the top of the wooden barrier to the top of the dirt pile. It was in a well-developed residential area. Children passed it in going to a nearby school.

The child and his mother had been in their back yard where she was engaged in hanging up clothes. After a few minutes there, the child went into the house through the back door. The mother went into the house to look for him and, not locating him there, found him, according to her testimony, 5 to 6 minutes after he had left her, floating, head down,

in the excavation. No one testified as to how or from what place he had fallen into it.

Plaintiff claims as error that defense counsel injected into the trial, and the court permitted to be considered as an issue, the contributory negligence of the child's parents as a defense to his action. The incidents relied upon for this contention are: (1) Inclusion in defendant Fattore Company's answer of a paragraph which, so plaintiff says, amounted to raising the defense of contributory negligence of the parents. This, upon plaintiff's motion, was ordered stricken from the answer before trial. (2) The statement of defense counsel at pretrial conference that the defendant company claimed that the proximate cause of the accident was the negligence of the parents in permitting so young a child to be out on the street alone and unattended, and, upon plaintiff's objection, the court's failure to comment thereon. (3) The defendant company's motion to consolidate the child's case with that of the father for his medical and out-of-pocket expenses and the court's refusal on the grounds that the contributory negligence of the parents, while a defense in the latter, could not be so in the former case. (4) Plaintiff's motion, before trial, that the court instruct defendants not to inject the issue of the parents' negligence into the trial, and the court's refusal so to do, the court saying that it had already ruled the matter of contributory negligence out of the case and that it could not and would not rule on the propriety of counsel's trial tactics until they occurred. (5) Defense counsel's questions to plaintiff's witness as to whether the mother previously had permitted the child to play outside alone, to which, upon plaintiff's objection, the court held the answers would be inadmissible, declining, however, to instruct defense counsel about future references to this matter during trial, saying that it would rule on questions as they arose. (6)

The court's overruling plaintiff's objection to the question whether the mother had told the witness where she was when the child fell in. (7) Defense counsel's saying, in his opening statement, that they maintained that they had a right to assume that parents of children of such tender years would take such care as is obvious. (8) The court's giving defendants' request to charge that they claimed they had a right to assume that children too young to protect themselves would not be allowed by their parents in the street without care or supervision and that defendants claimed that they could not have foreseen that parents would have permitted this.

Any of these incidents occurring before trial are without significance insofar as plaintiff's claimed right to a new trial is concerned.

Plaintiff cites *Keyser* v. *Chicago & Grand Trunk R. Co.,* 56 Mich 559 (56 Am Rep 405), as holding that a child of this age cannot legally be guilty of contributory negligence, and cases beginning with *Shippy* v. *Village of Au Sable,* 85 Mich 280, and ending with *Conners* v. *Benjamin I. Magid, Inc.,* 353 Mich 628 (67 ALR2d 1001), to the effect that the contributory negligence of the parents is no defense to the action of their child. In the instant case the court expressly charged the jury that they were not to consider the question of the contributory negligence of either the child or the parents because these would be no defense to this action.

To plaintiff's claims of error in this connection the answer of defendants and of the trial court is that the defendants were not raising as a defense the contributory negligence of the parents, but, instead, were undertaking to establish that defendants were guilty of no negligence which was a proximate cause of the child's injury and to invoke the related doctrine of foreseeability. They contend that their

claim as to their right to assume that such child would not be permitted alone on the street goes to the matter of what dangers they were obliged to foresee when they undertook to safeguard the public by placing barriers around the excavation, that whether they were negligent in what they did or failed to do in that respect depended on whether they had adequately protected against such dangers as they might reasonably have foreseen, that this presented a question of fact for the jury, thus entitling defendants to submit to the jury their theory as to what they should have foreseen, and that this depended on what they had had a right to assume.

In *Nash* v. *Mayne,* 340 Mich 502, 508, we quoted with approval from *Luck* v. *Gregory,* 257 Mich 562, 569, the following:

" 'In order to constitute proximate cause, it must appear the injury to plaintiff was the natural and probable consequence of the negligence or wrongful act of the defendant, and that it ought to have been foreseen, in the light of the attending circumstances.' "

In *Roberts* v. *Lundy,* 301 Mich 726, 730, this Court quoted with approval from *Clumfoot* v. *St. Clair Tunnel Co.,* 221 Mich 113 (syllabus), as follows:

" 'In an action for personal injuries alleged to be the result of defendant's negligence, in order that the plaintiff may recover it must appear that his injury was the natural and probable consequence of a negligent act or omission of the defendant which under the circumstances an ordinarily prudent person ought reasonably to have foreseen or anticipated might possibly occur as a result of such act or omission.' "

In *Clumfoot* this Court held that the question of what should have been foreseen or would have been

by an ordinarily prudent person was one of fact for the jury.

In the instant case it was for the jury to decide whether defendants were guilty of negligence which was a proximate cause and, as a preliminary thereto, whether they should have foreseen the possibility of an injury resulting from no greater barricading than they placed around the excavation. It follows that, touching the latter, it was for the jury to determine what assumptions defendants might make in attempting to foresee possible future occurrences and, hence, that it was proper for defendants to present proofs and arguments to the jury bearing on their theory as to what they might assume. It was still for the jury to decide the correctness thereof, and it was so left in this case.

Plaintiff claims the court erred in charging the jury on "unavoidable accident." In stating the claims of the parties to the jury the court said that this was one of the defense claims. Nowhere, however, did the court actually charge on that subject as defendants had requested. No error occurred in this connection. Furthermore, the court properly instructed on the issues of negligence and proximate cause and neither party offered corrective suggestions. Consequently, if there had been any error at all in this connection, it would have been harmless. *Lober* v. *Sklar*, 357 Mich 166.

The court instructed the jury "that the mere fact of an accident, happening or occurring is not evidence of negligence." Here the physical facts and the defendants' acts or failures to act were before the jury, affording an ample basis for determining the negligence question. Resort to speculations on the mere fact of the occurrence of an accident would have added nothing as a basis for a jury determination of negligence even in a jurisdiction embracing the *res ipsa loquitor* doctrine. The charge was in

terms previously approved by this Court. *Fuller* v. *Wurzburg Dry Goods Co.,* 192 Mich 447; *Brebner* v. *Sidney Hill Health System, Inc.,* 269 Mich 541; *Daigneau* v. *Young,* 349 Mich 632.

An instruction that neither defendant was an insurer of the safety of the public but was required only to use reasonable or ordinary care, cannot reasonably be said to have conveyed the idea to the jury that neither had liability insurance coverage. It was correct and not prejudicial to plaintiff.

The court charged the jury that:

"The duty of the city is to erect barriers that will guard, warn, or notify the traveling public, both drivers of motor vehicles and pedestrians, that there is an excavation to be avoided."

We think the general import of this sentence is not, as contended by plaintiff, that the words "guard", "warn", "notify" are used in the disjunctive, but, rather, cumulatively or synonymously. The court fully charged the jury that, as by statute provided, the duty upon defendant city was to keep the street "in condition reasonably safe and fit for travel." CL 1948, § 242.1 (Stat Ann § 9.591). That properly presented the question to be decided by the jury. We think no error occurred in this connection.

We are not impressed that the verdict is against the overwhelming weight of the evidence.

Judgment should be affirmed. Costs to defendants.

CARR and KELLY, JJ., concurred with DETHMERS, C. J.

SMITH, J. The essential fact before us is an excavation made by the defendants in a public highway in a residential area. It was located within a half block of a school attended by small children (its

classes extended from kindergarten through the sixth grade), as well as by handicapped children. The excavation was approximately 4 feet wide, 4 feet deep, and 16 feet in length.

This excavation the defendants allowed to remain open for some 28 days. It became filled with water to its brim. This condition was allowed to so persist for several days prior to the accident, despite the fact that it could have been pumped out in a matter of minutes with a suitable pump. It was an open invitation not only to disaster but to play. "I remember," testified a mother who lived directly across the street opposite the excavation, "it [the water] had been there days before because we had seen children throwing stones in the water and my husband and I would tell them that that was not what they should be doing." The hole was guarded by a mound of dirt on one side and by single planks, resting in part on sawhorses, on each of the other 3 sides.

The situation was, obviously, fraught with such hazard for children that another neighbor lady, who had observed the hole filled with water for the first time only the night before the accident, stationed herself there the next morning "and watched the children going to school." In addition she called the city hall, registered a complaint, and explained the situation—"that it was near a school, and there was a lot of small children around that neighborhood and I wanted it taken care of immediately, being a taxpayer." She planned to resume her vigil in time for the noon recess, about a quarter after 11, since the children would then again be passing the hole. Consequently, she left her house around 11:15 and was about half way there when she heard a mother screaming. A little boy (Jimmy Elbert, for whom action is here brought and who will be referred to

hereinafter, for purposes of clarity, as the plaintiff)[1] was floating in the water. His mother had gone out to the back yard to hang up the washing.

"In a few minutes," she testified, "Jimmy [then 2–1/2 years of age] scooted away and I heard the back door of our house slam and I knew he had the habit of going in. I knew he was there but when he didn't come right back I immediately went in to find him but he didn't answer so I hurried outside and ran around to the neighbor's house  *  *  *  [calling for him, but receiving no answer] so I immediately ran to the other neighbor's house and saw their dog standing there all wet.  *  *  *  The next thought was to look at those 2 excavations, after seeing the dog wet, that entered my mind immediately, and I went over to these 2 open excavations.  *  *  *

"I found Jimmy head down in the water and I screamed."

Artificial respiration was applied, with the use of oxygen, for 45 minutes. The child revived, but had suffered brain damage. A pediatrician testified that under the described conditions destruction of brain cells will begin within 2 to 3 minutes, will become serious at 5 minutes and fatal at 7. These brain cells, it was testified, do not regenerate and any damage done is permanent and irretrievable. The doctor's final diagnosis of plaintiff's condition was that of spastic hemiparalysis and personality change. Action having been brought therefor the jury, acting under instructions hereinafter to be discussed in part, returned a verdict for defendants.

A study of the record before us conveys an air of unreality about the entire proceedings. At times it seems as though the parties were trying another case,

---

[1] Actually the plaintiff is "Roland W. Elbert, guardian of the estate of James Roland Elbert, a minor."

involving other people. We have the persistently recurring questions, throughout the entire record, respecting the care and supervision exercised by the parents. But the parent's negligence (or lack of it) is not an issue here. We find references to the parents "letting their child wander away from home," or "allowing their child to wander around the streets," or "allow[ing] their minor children of this age to play [outside]." Yet nothing is clearer in the record than that the infant escaped from his mother's supervision while she was hanging out the washing in the back yard and there is no hint of permitting or allowing him to wander into the highway. Since the case is to go back for new trial, we will state that, upon the facts before us, there was no dereliction in parental care of, or obligation to, the infant before us. And, finally, we find the following:

*"Mr. Stanton:* I of course would abide by the court's ruling but I propose to prove here that the parents in this case knew that the boy was the type of a boy that was likely to do almost anything.

"As a matter of fact, they called him 'fearless Jimmy' because he was always getting into trouble and if I can't prove that, and that's what I intend to prove by some of these witnesses, I might as well quit."

It would be well to bring this case back to reality before we enter upon its legal analysis. The plaintiff before us was not an adult, nor even a reasoning child. He was actually, at this time, an infant, of the age of 2 years and 8 months. Our own knowledge of the characteristics of this age are meager. The experiences, whatever they may have been, are buried back in the fog of time. But the monumental work of Gesell and Ilg[2] does not lack for

2 Gesell and Ilg, Child Development, pp 177–201.

detail. A child of this age is, indeed, "always getting into trouble." He has not yet fully mastered bladder and bowel control. He is subject to contrary impulses. Though exuberant, he has not learned the consequences of his actions and hence, to an adult, acts paradoxically. There is much of what we call fantasy in his existence. He talks to his toys. His crib becomes, at times, a bus or a railroad train. He has no accurate perception of space or size and thus may fear that he will be sucked down the drain with his bath water. To characterize such an infant to the court as "fearless Jimmy" is (and we use these words after mature deliberation, since for us they set a precedent) utterly ridiculous. If this is the attitude with which this case was approached, if this was the atmosphere in which it was tried, it must be tried again, for another plaintiff's case was being heard. "Fearless" this particular plaintiff may have been in his crib as he talked to his playthings, but fearlessness as it applies to any legal issue in this case involves a conscious choice of alternatives and an awareness of resultant consequences. This particular plaintiff (and his is the only case being tried) was completely incapable of making such a choice. It is pertinent, also, to observe at this point that to charge a jury, as was here done, that a city discharges its duty to such an infant by erecting "barriers that will guard, warn, or notify the traveling public" is inadequate and erroneous. In the first place, the duty is not in the alternative, to guard, warn, or notify, but in the conjunctive, to guard, warn, and notify. Notification, as that term is ordinarily employed, is not adequate with respect to those handicapped, deficient in sight or understanding, but who are, nevertheless, deserving of care, particularly in the use of a highway open to all. Moreover, the charge must be related to the facts. We are not trying the case of the "traveling" public.

We have an infant unable to read or to reason or to understand the signs sufficient for an adult. Whether or not the barriers erected were reasonable for the protection of such an infant will be a matter for jury determination, under the proper instructions, it being axiomatic that the greater the hazard the greater the care required. If there is reason to foresee the presence in this area of small children (a point we will hereinafter discuss in some detail), the duty to guard includes guarding with respect to such children.

The principal error claimed by appellant relates to the legal duty involved, for the asserted breach of which action is brought. The defendants assert, in reply, a lengthy argument as to proximate cause. It only obscures legal analysis to lump together, as 1, these 2 concepts. A duty arises because of a relationship between the parties. Should it be found to exist, an actor has an obligation to conform to a certain standard of conduct. Proximate cause, on the other hand, once there is cause in fact, involves the cut-off problem, the problem of where to draw the line as to liability. To somewhat oversimplify, the one looks at obligation, the other at consequences. It is possible, of course, as a matter of terminology, to phrase any question relating to duty, breach, or the consequences thereof, any question, indeed, relating to negligence, in terms of "proximate cause." But when we do so we obscure the whole process of decision, we scramble the functions of judge and jury, and we conceal the critical issues of policy involved shaping judgment. In short, we lower a "word curtain" over what is going on. So what? What harm is done? Is it just a matter of verbiage? This case furnishes a vivid answer.

The defendants assert that they could not reasonably foresee that a person of plaintiff's class would be injured by the condition created by them: "We

say that in this case the defendant could not reasonably foresee or expect that a 2–1/2-year-old child of the intelligence of a child of that age, would be allowed to wander around the streets and fall in this hole which had barricades which warned the public of its existence."

What the defendant is talking about here is duty. The concept of duty was foreign to the early law, as indeed was the concept of negligence itself. As private law gradually evolved beyond its primary original function, the prevention of private warfare,[3] the negligence concept slowly took definite form and shape. One clear way in which a defendant might be negligent was to fail in the performance of a recognized legal duty, such as one assumed in a public office or calling, or from a bailment, or control of a dangerous article.[4] The established writs were adequate to answer the procedural requirements in such cases and where there was the writ there was the right. It is only in modern times that we struggle, still in some cases unsuccessfully, to reverse the archaic process. The courts quite naturally, then, as Harper and James put it, came "to look on negligence as the correlative of a duty not to harm plaintiff in the manner of which he was complaining."[5]

Whatever may have been the historical antecedents of the concept, it is now firmly established as a part of the law of negligence. "This Court," we have held, "is committed to the doctrine that where there is no legal duty there can be no actionable negligence."[6]

The commitment is not unique to us. It is the *sine qua non* of negligence law, the requirement (a "duty") that people in an ordered society must con-

---

[3] See *Stewart* v. *Rudner*, 349 Mich 459, 466.
[4] Winfield, Duty in Tortious Negligence, 34 Columbia L Rev 41.
[5] Harper and James, Torts, § 18.1, at p 1016.
[6] *Butrick* v. *Snyder*, 236 Mich 300, 306.

form to a certain standard of conduct in their relations one with another. Phrased in another way, the problem of duty is simply the problem of the degree to which one's uncontrolled and undisciplined activities will be curtailed by the courts in recognition of the needs of organized society. This determination those of the vicinage are not trained to make, however faultless their composite judgment may be as to which of their neighbors is lying and which is telling the truth. It involves, as we have seen, much of legal history, of precedent, of allocations of risk and loss.[7] Prosser puts it succinctly. In discussing the apportionment of responsibilities between judge and jury he states among the duties of the court "the determination of any question of duty—that is, whether the defendant stands in such a relation to the plaintiff that the law will impose upon him any obligation of reasonable conduct for the benefit of the plaintiff. This issue is one of law, and is never for the jury."[8] This is not to say, of course, that fact issues may never be involved in the application of the rule. In event "varying inferences are possible," in Mr. Justice Cardozo's words, there is "a question for the jury."[9] Thus questions may arise as to whether or not an area in which a hazard is created is an area within which humans normally move. The duty imposed in this area will depend upon the facts found respecting its use, but the enunciation of the duty upon the facts found is for the court, not the jury.

It is just at this point that serious error was committed below. The court, following defendant's theory, charged the jury as follows:

[7] See Green, The Duty Problem in Negligence Cases (pts. 1, 2), 28 Columbia L Rev 1014, 29 Columbia L Rev 255, reprinted in Green, Judge and Jury, ch 3.

[8] Prosser, Torts (2d ed), § 50, at p 281.

[9] Palsgraf, post, 248 NY 339, at p 345.

"Therefore, if you find in this case that this defendant Fattore Company could not reasonably foresee that a child too young to be guilty of contributory negligence would be in the streets without care or supervision, the defendant Fattore Company would not be responsible and your verdict must be no cause of action as to the defendant Fattore Company."

The court here is charging with respect to defendants' duty to children of plaintiff's class. Essentially the question is whether the interests of this class of plaintiff are entitled to protection against the defendants' conduct. Stated in another way the question is whether these defendants are under any obligation with respect to infants in this area.[10] Are the infant children of the neighborhood within the "zone of danger" with respect to the hazard created by the negligence of the defendant? This problem, as we have stated, is for the court, just as would be, for instance, the question of whether there is a landowner's duty of care towards an infant trespasser,[11] or whether there is a duty owed by a manufacturer to the ultimate consumers of his product.[12]

The *Palsgraf Case,* also, involved the problem of duty, though in simpler form and at the opposite extreme. Mr. Justice Cardozo (then chief judge of the New York court of appeals) phrased it, in part, in these terms:[13]

"What the plaintiff must show is 'a wrong' to herself, *i.e.,* a violation of her own right, and not merely a wrong to someone else, nor conduct 'wrongful' because unsocial, but not 'a wrong' to anyone. We are told that one who drives at reckless speed through

---

[10] Prosser's discussion is particularly helpful in this area. Prosser, Torts (2d ed), § 36.

[11] See *Lyshak* v. *City of Detroit,* 351 Mich 230.

[12] See *Spence* v. *Three Rivers Builders & Masonry Supply, Inc.,* 353 Mich 120.

[13] *Palsgraf* v. *Long Island R. Co.,* 248 NY 339, 343, 344 (162 NE 99, 100, 59 ALR 1253, 1256).

a crowded city street is guilty of a negligent act and, therefore, of a wrongful one irrespective of the consequences. Negligent the act is, and wrongful in the sense that it is unsocial, but wrongful and unsocial in relation to other travelers, only because the eye of vigilance perceives the risk of damage. If the same. act were to be committed on a speedway or a race course, it would lose its wrongful quality. The risk reasonably to be perceived defines the duty to be obeyed, and risk imports relation; it is risk to another or to others within the range of apprehension. Seavey, Negligence, Subjective or Objective, 41 Harv L Rev 1, 6; *Boronkay* v. *Robinson & Carpenter,* 247 NY 365 (160 NE 400). This does not mean, of course, that one who launches a destructive force is always relieved of liability if the force, though known to be destructive, pursues an unexpected path. 'It was not necessary that the defendant should have had notice of the particular method in which an accident would occur, if the possibility of an accident was clear to the ordinarily prudent eye.' "

In reversing, as a matter of law, the trial court's denial of defendant's motion to dismiss, the majority of the New York court held that as to Mrs. Palsgraf, the plaintiff, there had been no negligence. "Negligence," held Mr. Justice Cardozo, "like risk, is thus a term of relation."[14] The relationship, giving rise to the duty, must be such that jeopardy to her interests with respect to bodily security is within the range of reasonable apprehension. What, under this analysis, is the relationship before us? The hole in the street, water-filled, was within the immediate proximity of the plaintiff's home. It was in the public highway, a place where this child was no trespasser. A boy, we held in *Beaudin* v. *Bay City,* 136 Mich 333, 338 (4 Ann Cas 248, 16 Am Neg Rep 108), "may be a traveler on the highway who is in fact

---

[14] *Id.,* at p 345 (162 NE at p 101, 59 ALR at p 1257).

traveling over it in a proper manner, although that traveling includes play or pastime." In other words, he is not an outlaw because he is not on business, as adults use the term. He remains entitled to freedom from injury, negligently inflicted. The excavation, moreover, was near a school and in an area frequented by children. It was filled with water, the presence of which, as we have seen, drew children to it for play. This plaintiff, unlike Mrs. Palsgraf, was well within the zone of risk created by defendants' act.

Under these circumstances what is the reasonable apprehension as to injury from the hazard created? Here a jury has been permitted to say that no reasonable person would anticipate that an infant might escape from its mother and enter upon the public highway, there to be exposed to danger from this water hole. We, of course, are constantly admonished, while driving, to proceed with caution in residential areas, and, particularly, in the vicinity of schools. We are reminded that every time a ball rolls into the street we are to presume that it is attached to a child, who will follow it, and we are fully aware of the attractiveness of many nuisances to children. For such and related reasons legislative bodies have universally placed laws on the books requiring drivers to slow down in residential areas, and in the vicinity of schools. Why? Because children are apt to get into the streets, where they have no business to be. We of the courts, in turn, have held drivers negligent for not driving with due care in such areas. Why? Because children are apt to get into the streets, where they have no business to be. But here a jury is permitted to say that the water hole in the street imposes no duty of care upon these defendants. Why? Because children are *not* apt to get into the streets, where they have no business to be.

In short, Justice, in all her majesty and with all her wisdom has been permitted to peer down upon this child standing at her bar and solemnly say to him that the water-filled hole in the public street in front of his home was of no concern to him. If the words penetrate his damaged brain at all, and he makes bold to ask why, the answer is clear: "Because to you there is no danger. No reasonable person could ever anticipate that you might escape from your mother and run into the street and fall into the hole."

All of this is straight from outer space. It is pure fantasy. It is unrelated to life on this earth. It requires no treatise on child development to tell us that a child 2 years 8 months of age is as inquisitive as a hornet and as slippery as an eel. Despite the utmost vigilance he will at times, when the mother is cooking, or washing, or caring for others, make his get-away. Is the situation as to his safety in this event as though he lived on the frontier, or in the jungle, or does modern urban society demand more for its young? Should the penalty visited upon him, who is not even aware of his fault, exceed the well-known measures of normal family discipline? Or should it include brain damage or death? It is our answer to give, not his.

Upon these facts we hold in the words of Mr. Justice Cardozo that the possibility of an accident to any infant in the street "was clear to the ordinarily prudent eye." No "varying inference" is possible.[15]

---

[15] *Palsgraf* v. *Long Island R. Co.*, 248 NY 339, at p 345 (162 NE at p 101, 59 ALR at p 1257):

"The range of reasonable apprehension is at times a question for the court, and at times, if varying inferences are possible, a question for the jury. Here, by concession, there was nothing in the situation to suggest to the most cautious mind that the parcel wrapped in newspaper would spread wreckage through the station. If the guard had thrown it down knowingly and willfully, he would not have threatened the plaintiff's safety, so far as appearances could warn him. His conduct would not have involved, even then, an unreasonable probability of invasion of her bodily security. Liability can be no greater where the act is inadvertent."

Thus a duty existed as a matter of law. We are, it will be noted, not called upon to resolve the classic controversy as to whether there may be either a plaintiff or a compensable consequence beyond the horizon of the risk from the threatening source, for here, within the range of sight, adventure, and reasonable apprehension, we find both the hazard and the victim.

The matter of proximate cause, to which so much of appellees' argument is directed, may be summarily disposed under the analysis made. In the first place we have no quarrel with such general statements of the law of proximate cause as that found in the first syllabus of the *Clumfoot Case.*[16] It tells us that, for a plaintiff to recover, his injuries must be the natural, probable, and foreseeable consequences of the defendant's act or omission, and that the jury must so decide. Such, I take it, is the normal course of events at trial. But the broad dogma does not solve particular cases. Here, if the injury is found to have resulted from the inadequacy of the barriers, there can be no reasonable divergence of thought on the matter of causation. This is no freak accident, no never-to-be-repeated combination of time, event, and circumstance. "If the defendant excavates a hole by the side of the road, and the plaintiff's runaway horse [but not his runaway infant?] runs into it, it scarcely can be pretended that the hole was not a cause of the harm, and a very important one."[17] To borrow once more from *Palsgraf,*[18] "The law of causation, remote or proximate, is thus foreign to the case before us." Here, while not foreign in the sense employed by Mr. Justice Cardozo, it is equally not in issue, if the injury is direct, immediate, consequential, and

---

[16] *Clumfoot* v. *St. Clair Tunnel Co.*, 221 Mich 113.

[17] Prosser, Torts (2d ed), § 44, at p 219.

[18] *Palsgraf* v. *Long Island R. Co.*, 248 NY 339, at p 346 (162 NE at p 101, 59 ALR at p 1258).

without intervening force or cause. In such event there is no properly controverted issue of proximate cause before us.

Finally, it is objected that the jury was instructed that neither defendant was an insurer (which term is nowhere defined in the charge) of the safety of the public and was required to use only ordinary care. But I find no claim made relating to an insurer. What plaintiff claims is negligence. His cause of action is not to be characterized to the jury as something it is not. At best it is argumentative. At worst it sets up a straw man, in the demolition of which plaintiff's cause may fall as a by-product.

In view of what has been said, it should be unnecessary to write in detail of the manner in which the court should, upon the new trial, deal with defendants' claim that this was an unavoidable "accident." Unavoidable some such injury may have been (depending upon the adequacy of the barriers), once the hole was dug in the street in this neighborhood, and allowed to remain filled with water, but if so the unavoidability does not operate to relieve the defendants of liability, and such must be made clear to the jury by appropriate language in the charge.

Reversed and remanded for new trial. Costs to appellant.

EDWARDS, KAVANAGH, and SOURIS, JJ., concurred with SMITH, J.

BLACK, J. (*concurring*). For reasons given over my signature in *Hopkins* v. *Lake,* 348 Mich 382, 391; *Conners* v. *Benjamin I. Magid, Inc.,* 353 Mich 628 (67 ALR2d 1001), and *Nielsen* v. *Henry H. Stevens, Inc.,* 359 Mich 130, 133, I hold that the studied injection into this child's case of the subject of parental fault, contributory or otherwise, constitutes reversible error. My vote to reverse is accordingly cast.