## MAY *v.* GOULDING.

1. PARENT AND CHILD — NEGLIGENCE — FIREARMS — MENTALLY-DEFI-
CIENT CHILD.

Evidence adduced in deputy sheriff's action against parents of
15-year-old mentally deficient boy for bullet-inflicted injuries
received when attempting to apprehend boy who had shortly
theretofore committed a holdup while home from mental in-
stitution to which he had been committed, *held,* sufficient to
warrant jury finding that both parents were actionably negli-
gent in permitting the boy to have a rifle and ammunition
therefor.

2. NEGLIGENCE—GROSS NEGLIGENCE—SPECIAL QUESTIONS.

Submission of special questions as to whether either of the de-
fendants was guilty of gross negligence was reversible error,
where there was no issue in the case as to wilful and wanton
misconduct or gross negligence on the part of either of the
defendants (CL 1948, § 618.39).

3. TRIAL—SPECIAL QUESTIONS—PLEADING.

The submission of special questions to the jury, which called for
answers on issues of law rather than of fact, was prejudicial
to the rights of all parties, since all were entitled to jury find-
ings conformable with and restricted to the issue pleaded and
tried (CL 1948, § 618.39).

4. SAME—SPECIAL QUESTIONS—INSTRUCTIONS.

Special questions must involve issues of fact, rather than law,
inasmuch as it is for the court to instruct the jury as to the
law applicable to such facts as they may find (CL 1948 § 618-
.39).

---

REFERENCES FOR POINTS IN HEADNOTES

[1] 39 Am Jur, Parent and Child §§ 56, 60.
Liability of person permitting child to have gun, or leaving gun
accessible to child, for injury inflicted by latter.   68 ALR2d
782.
[2] 38 Am Jur, Negligence §§ 47, 362, 365.
[3, 4] 53 Am Jur, Trial § 1070 *et seq.*

Appeal from Saginaw; Huff (Eugene Snow), J. Submitted April 14, 1961. (Docket No. 35, Calendar No. 48,226.) Decided December 1, 1961.

Case by Martin May against Claude G. Goulding and Mary E. Goulding for damages for personal injuries inflicted by firearms in hands of defendants' mentally deficient son. Verdict and judgment for plaintiff. Defendants appeal. Reversed and remanded for new trial.

*Peter F. Cicinelli* (*Eugene D. Mossner,* of counsel), for plaintiff.

*Stanton, Taylor & McGraw* (*H. Monroe Stanton* and *Albert C. Reinert,* of counsel), for defendants.

BLACK, J. This case involves the common-law rule that a parent may be found guilty of actionable negligence for having intrusted—or having made accessible—a firearm or other deadly weapon to his mentally deficient child. Restatement's comment, on clause (c) of section 877 (4 Restatement of Torts, pp 442–444), portrays the general rule:

"d. A person who has voluntarily taken charge of an insane or otherwise dangerous person, a prison guard or officer having custody of or a duty to control a criminal or other person who he has reason to know will cause harm if he escapes, a parent having a minor child who has manifested dangerous propensities,—all are under a duty of care to prevent those whom they control or should control from harming third persons and are liable to third persons for harm resulting from a failure to exercise care (see 2 Restatement, Torts § 319)."

Plaintiff, a Saginaw county deputy sheriff, was seriously injured by a gunshot wound inflicted when Gordon Goulding, the mentally ill 15-year-old son

of the defendants, fired at him in the circumstances of tragedy shown here. The boy had been committed to the Traverse City State hospital, an institution of confinement for the mentally ill. He was home —in Saginaw—upon temporary permission the hospital authorities had granted at his request (a similar request had been granted with respect to the preceding Christmas holiday). While the defendant father was at work, and the defendant mother away from home for a short time during the afternoon of February 20, 1958, Gordon loaded his semiautomatic rifle* and held up a nearby grocery store. No shot was fired at anyone during the holdup. Gordon did, however, fire a shot into the floor to induce compliance with his demand for money. Thereupon Gordon repaired to the home of his parents. A few minutes later, several Saginaw police officers having driven up, Gordon opened and continued fire on them from the porch and then from behind the partially closed front door. His first shot penetrated the windshield of the lead squad car, narrowly missing Police Sergeant Pawlik. In the meantime plaintiff had been sent to aid the city officers. Shortly after he joined one of them, in an adjacent garage, Gordon's well aimed bullet struck plaintiff in the head.

The present suit for negligence followed. Plaintiff relies principally upon the rules of duty and breach found in 39 Am Jur, Parent and Child, § 56, p 692 ("Where Instrumentality is Intrusted or Accessible to Child") ; 39 Am Jur, Parent and Child, § 58, pp 695, 696 ("Failure to Control Child; Knowl-

---

* The rifle—Winchester .22 caliber—was given to Gordon by the father, or by the parents together (there is a dispute of fact whether the mother joined in making the gift), for Christmas of 1957. Gordon had been permitted to go home with his parents for the holiday and the gift was made on that occasion. Defendants claim the gift was encouraged by one of the doctors in charge of the hospital, as good "mental therapy," and it was shown without dispute that the doctor had taught the boy to target shoot—on the rear hospital grounds— with a single shot rifle of like caliber.

edge of Mischievous or Reckless Disposition"); 39
Am Jur, Parent and Child, § 60, p 697 ("Tort of
Insane or Mentally Deficient Child"); 1 Harper and
James, Law of Torts, § 8.13, p 662; 2, 4 Restatement
of Torts, §§ 308, 316, 877; and the recent annotation
headed "Liability of person permitting child to have
gun, or leaving gun accessible to child, for injury in-
flicted by the latter," 68 ALR2d 782.

Trial to court and jury resulted in verdict and
judgment for plaintiff in the sum of $40,000. De-
fendants appeal.

*First:* We agree with plaintiff's counsel that the
adduced proof was legally sufficient to warrant a jury
finding that both defendants were actionably negli-
gent under the above cited rules of the common law.
Indeed, coupling the admissions made by them in
their answer* with plaintiff's proof that the rifle and
several hundred rounds of ammunition for it were
left accessible to the boy in the defendants' home,
the trial judge could do naught but submit the case

---

* Summarized, the pleadings by allegation and admission establish
that the boy "had a life-long history of maladjustment"; that the
boy from infancy was "antisocial" and "subject to temper outbursts
and rages"; that he had on previous occasions viciously assaulted
school classmates and total strangers; that the defendant parents had
been advised "by psychiatrists and/or medical doctors" that the boy
was suffering from a mental disorder (describing it in detail); that
the parents were well aware that the boy "was likely to resort to
violence" and that he "was potentially dangerous to himself and
society"; that in October of 1956 the boy "was confined to a State
institution for the mentally ill"; that the boy's conduct following
release from such institution was belligerent, vicious, and aggressive;
that he displayed "an abnormal mania for guns, knives, and other
types of dangerous weapons"; that the defendant father, knowing
and realizing the situation, finally petitioned for commitment of the
boy to a State institution as being mentally ill, which petition resulted
in an immediate or "emergency" order of commitment dated October
25, 1957, and a subsequent order (following a regular hearing)
adjudging the boy a mentally ill person and directing his commitment
to the above State institution.

This last order was entered November 15, 1957. The record shows
that the defendant mother participated in the probate court hearing,
as a witness, and that she joined her husband in support of the statu-
tory petition for commitment. She was not sworn as a witness, by
any party, during trial of this case.

according to the above rules of duty and breach. Defendants' respective motions for directed verdict therefore were properly denied.

*Second:* The trial judge, having rejected other forms of like questions proposed by counsel, submitted—on his own motion—4 special questions to the jury. Proceeding under the statute (CL 1948, § 618.39 [Stat Ann § 27.1019]), he directed the jury to return a general verdict together with answers to such special questions. The submitted special questions are as follows:

"1. Was the defendant Claude G. Goulding guilty of wilful and wanton misconduct or gross negligence in this case?

"2. Was the defendant Mary E. Goulding guilty of wilful or wanton misconduct or gross negligence?

"3. Were the actions of the plaintiff Martin May on February 20, 1958, such as to make him guilty of contributory negligence in this case?

"4. Were the actions of the plaintiff Martin May on February 20, 1958, such as to make him guilty of gross negligence in this case?"

The jury answered all 4 questions in the negative.

Defendants claim that submission of these questions to the jury was reversible error. We agree.

In the first place there was no issue in the case of "wilful and wanton misconduct or gross negligence." Plaintiff neither declared nor proved any theory that defendants' conduct amounted at common law to wanton or reckless disregard of the safety of others. See 2 Restatement of Torts, § 500, pp 1293–1297; also discussion by Mr. Justice SMITH, in *Sun Oil Company* v. *Seamon,* 349 Mich 387, 408–411, summarized thus (p 411):

"The reasoning behind these cases is clear: Wanton misconduct is a different kind of offense than ordinary negligence, even though it be gross. Fault is involved in both, but in the one the fault of the

callous, the brutish, the quasi-criminal, in the other the human frailty of lack of care, of inattention, of diversion. These are faults of different hues in the spectrum of human conduct and so the courts have treated them."

If the defendants are liable in this case they are liable for negligence, nothing more. The judgment now reviewed rests exclusively on that ground, as must any judgment for plaintiff entered on the pleaded issue. Even though the degree of care exacted of defendants by the common law was commensurately high, their conduct was not such as would entitle plaintiff to recover on the theory of gross negligence the special questions below sent into the jury room.

In the second place the submitted questions called for answers, by constituted fact finders, on issues of law rather than of fact. To submit questions of such nature, especially with repeated instructions pertaining to a false issue not framable under the proofs, was prejudicial to the rights of all parties since all were entitled to jury findings conformable with and restricted to the issue of negligence they had pleaded and tried.

See *Banner Tobacco Co.* v. *Jenison,* 48 Mich 459, and *Loomis* v. *Township Board of Rogers,* 53 Mich 135, holding that special interrogatories presenting questions of law, or mixed questions of fact and law, are improper; also the "author's comment" under section 6 of Court Rule No 37 (Honigman, Michigan Court Rules Annotated, p 378):

"Special questions must involve issues of fact, rather than law, inasmuch as it is for the court to instruct the jury as to the law applicable to such facts as they may find."

Citing among other authorities the *Banner Tobacco Case* the court of appeals of our sixth circuit has considered and rejected special questions tender-

-ing issues of law or mixed issues of law and fact (*Carpenter* v. *Baltimore & O. R. Co.* (CCA 6), 109 F2d 375, 379). After quoting the interrogatories in question (submitted as here on motion of the trial judge in a negligence case) the circuit court of appeals said:

"The failure to ask as to facts on which carelessness or contributory negligence is sought to be predicated is a fatal defect in the foregoing interrogatories and renders the answers abortive.

"Interrogatory No. 1 did not ask the jury to find whether there was a defect in the crane but required it to ascertain whether the defect could have been discovered by the exercise of ordinary or reasonable care which was a question of law. The same imperfection is found in the others.

"If not questions of law singly, they are mixed questions of law and fact which are improper in interrogatories. *Runyan* v. *Kanawha Water & Light Company,* 68 W Va 609 (71 SE 259, 35 LRA NS 430); *Banner Tobacco Company* v. *Jenison,* 48 Mich 459; *Toledo & W. R. Co.* v. *Goddard,* 25 Ind 185; *Louisville, N. A. & C. R. Co.* v. *Worley,* 107 Ind 320 (7 NE 215)."

The case is presently in point, the court having held that jury instructions tendering an issue not supported by the pleadings constitute reversible error; also that such error of instruction is not cured by the jury's answers to the erroneously submitted special questions.*

Reversed and remanded for new trial. Costs to defendants.

DETHMERS, C. J., and CARR, KELLY, EDWARDS, and KAVANAGH, JJ., concurred with BLACK, J.

---

* One of such erroneously submitted questions, No. 3 in the case like No. 3 here, presented for written jury answer question whether the plaintiff was guilty of contributory negligence. The form of the question (p 379):

"Was the plaintiff himself guilty of negligence which contributed to cause the occurrence which resulted in the injury to him?"

SOURIS, J. The following opinion, which I adopt as my own, was written by Justice TALBOT SMITH prior to his departure from this Bench:

So far as the briefs and our independent research disclose, this case has no precedents, certainly none in this jurisdiction. Here a paroled mental patient, Gordon Goulding, decided he would prefer to be sent to prison rather than to be returned (at the conclusion of his parole) to the State hospital where he had been confined. Consequently he set out to commit the crime which would lead him to sanctuary. He took his .22 rifle from his home, went to a nearby grocery store, fired a shot into the floor, then said "I am Gordon Goulding * * * Call the police." When the police arrived, he shot and injured the officer who is the plaintiff in this case. A jury has been permitted to find the boy's parents liable for the officer's injuries (Gordon was staying at home) though it is clear from the record that his act was as unexpected by them as it undoubtedly was by the hospital authorities who had temporarily freed him.

The problems of parole (and of the parolee) have become increasingly important with the increasing use of parole as a therapeutic device. At the same time these problems have become increasingly complex because of the pressures and tensions of modern society, especially as regards mental patients. The literature on the subject is abundant,[1] and the bibliographies contained in the references in the footnote will be found helpful to those whose professional duties require further exploration of the matter.

The confinement of the mentally ill is intended to accomplish a dual purpose: (a) properly to care for and treat the defectives, so that, if possible, some day they may take their place in society as useful citizens, and (b) properly to restrain, so that those

[1] See Giardini, The Parole Process (1959), and Tappan, Contemporary Correction (1951).

of vicious or dangerous tendencies may not inflict harm upon the persons or property of others.[2]  But in the performance of the rehabilitative function certain risks are involved.  A determination must be made as to when, if ever, it is safe to restore the patient to society, and under what conditions.  There are, obviously, opposing considerations.  On the one hand, too-lengthy retention defeats rehabilitation, with consequent human waste, adds to the citizens' tax burdens, tends to stagnation in existing institutions, and thus results in the rejection of patients possibly more in need of help.  On the other hand, a premature conditional release may subject to danger of harm not only the patient himself but all of those with whom he comes into contact.  Such are some of the imponderables to be weighed in the balance by those entrusted with the patient's care.  Here the decision, unfortunately as it turned out, was to parole.  Injury, as we have seen, has resulted from the patient's acts while temporarily freed.  Where, in this situation, should liability for the injury be placed?

Complex considerations of public policy arise at this point.  We may exclude, as a solution, imposing liability on the tortfeasor himself, for obvious reasons.  If we place liability upon the governmental officials who authorized the release (should they not be immune from suit), the inevitable effect, unless those officials obtain protection against personal liability, will be not only to bring to an end this phase of the rehabilitation process but also to make it increasingly difficult to obtain properly trained doctors for service in the State's mental institutions.  For the truth seems to be that it is very difficult to foretell with any degree of accuracy whether a schizophrenic, for instance (Gordon had been so

2 *Excelsior Ins. Co. of New York* v. *State of New York* (1946), 296 NY 40 (69 NE2d 553).

diagnosed), apparently aided, will revert to his former ways. In *United States, ex rel. Smith,* v. *Baldi* (CCA 3, 1951), 192 F2d 540, 563, the psychiatrist testified, "I have seen them [schizophrenics] stay well for 20 years and I have seen them relapse within a year."

But the difficulties of the doctor in estimating the patient's degree of recovery will be as nothing compared to those of the layman to whom the patient must be paroled, if parole there is to be. The doctor has his experience, his learning, upon which to rely. The layman has nothing, save the doctor's word. If the doctor says the patient is ready for release, his judgment must be accepted or the rehabilitation process, so far as parole is concerned, be brought to an end. No thinking person would accept the custody of a parolee should the law be that in so doing he risks his entire fortune in a possible future damage suit by a third party, arising from the distorted judgment of a mental patient, who, after all, has not been discharged as cured but is merely on temporary parole.

Obviously, a negligence-contributory negligence action is a crude vehicle for the resolution of social issues so complex and so important. Nevertheless, lacking legislative aid, it is all we have at the moment and we must do what we can with it. With respect to the issues before us, however, the negligence action is saved from complete futility by a proper application of its basic concept, the legal concept of "duty." This, as we pointed out recently,[3] is the determination that there is a reasonably foreseeable risk to at least the class of persons of whom the plaintiff is one. In other words, and with respect to the case at bar, did these parents take steps to avoid omissions (in Gordon's case) which they could reasonably foresee would be likely to result in injury to others? This is,

---

[3] *Elbert v. City of Saginaw* (1961), 363 Mich 463.

of course, far from a simple determination. Here lies the very heart of negligence, for it is clear that the concept of foreseeability is not purely and simply a matter of crystal-ball prophecy, of astrology, or of incantation. It involves, in addition, those matters of risk hereinbefore described. As we put it in *Elbert, supra,* 476:

"The problem of duty is simply the problem of the degree to which one's uncontrolled and undisciplined activities will be curtailed by the courts in recognition of the needs of organized society. This determination those of the vicinage are not trained to make, however faultless their composite judgment may be as to which of their neighbors is lying and which is telling the truth. It involves, as we have seen, much of legal history, of precedent, of allocations of risk and loss. Prosser puts it succinctly. In discussing the apportionment of responsibilities between judge and jury he states among the duties of the court 'the determination of any question of duty—that is, whether the defendant stands in such a relation to the plaintiff that the law will impose upon him any obligation of reasonable conduct for the benefit of the plaintiff. This issue is one of law, and is never for the jury.' This is not to say, of course, that fact issues may never be involved in the application of the rule. In event 'varying inferences are possible,' in Mr. Justice Cardozo's words, there is 'a question for the jury.' Thus questions may arise as to whether or not an area in which a hazard is created is an area within which humans normally move. The duty imposed in this area will depend upon the facts found respecting its use, but the enunciation of the duty upon the facts found is for the court, not the jury." (Footnotes omitted.)

What, then, could Gordon's parents reasonably foresee as to his conduct upon parole upon the information available to them at that time? We have searched the record in vain for any warnings given

them, any precautionary measures they were direct-
ed to observe. This is the more significant because the
parole was not at their request. In effect, expressly
or by necessary implication, the doctors said to the
parents, when they permitted this patient tem-
porarily to return to his home, that a normal home
environment was safe for him. The normal home,
of course, contains many articles that can be put to
dangerous use by a distorted mind. Matches are
available, should arson be contemplated; kitchen
knives, ice picks, and so on, are usually available for
misuse, even hunting rifles and firearms.

Much is sought to be made of an alleged unusual
interest by Gordon in firearms. In fact, plaintiff's
brief criticizes the parents for leaving Gordon
"alone in the house with rifles and ammunition,
especially in view of the fact that he admittedly had
a mania for such weapons, and with them he might
well injure someone." The language here used is
not justified by the record, the relevant portions of
the testimony of Gordon's father containing the fol-
lowing:

"*Q.* Now, is it true that you told these psychia-
trists, all the psychiatrists, in fact, you talked to,
that Gordon had a what you called a mania for guns
and knives?

"*A.* He had a liking for them, yes.

"*Q.* Now, you had a problem with reference to
these knives, did you not, thrown around the house,
sticking around the walls, and the floors?

"*A.* Oh, no, no.

"*Q.* What did Gordon do about the knives that
gave you that opinion that he had an unusual mania
for knives?

"*Mr. Stanton* [defendants' attorney]: He didn't
say he had a mania, he said that he had a liking.

"That is your way of thinking.

"*Q.* Did you have any problem with reference to
that?

"*A.* No—I am trying to think if we did. I can't think of anything."

The argument made, moreover, is even more inconsistent with the doctor's treatment of Gordon while in the State hospital. In the first place, Gordon's record did not stress firearms. "There was," testified Dr. Curran, "a little reference in his record to his wishing to obtain a gun at an earlier date." Moreover, as Gordon showed progress, the doctor permitted him to join in target practice, and he testified that he had no fear of placing a gun in Gordon's hands. In addition, with respect to the parent's treatment of Gordon, we find the following:

"*Q.* And did you tell the father at that time that it was good therapy to take the boy hunting to show trust and confidence in him?

"*A.* I told him it was good therapy to give the boy attention, as I remember it.

"*Q.* Didn't you also say it was good therapy to, for the father and son to go hunting or using a gun?

"*A.* I very well may have said that; I can't be certain whether I did."

Actually, at no point in the course of treatment do we find the emphasis now sought to be placed upon firearms, or any unusual significance attributed to them. Thus, an assault in Chicago, which caused Gordon to be sent home from military school, did not involve firearms, and there were no special warnings given the parents with respect to firearms when Gordon was paroled. Of course, as a matter of hindsight it would have been better if Gordon had not been paroled at all. But the legal problem in this case, it may be well to remind ourselves once more, involves not hindsight but foresight, the problem of "duty."

Was Gordon's action foreseeable by his parents, the defendants here? Of course not, certainly no

more so by them than by his doctors. Nevertheless, will we *say* that it was? A court can, of course, always simply hang its hat on the wall and say that anyone can foresee anything, for example here, specifically, that Gordon would commit a crime in order to go to prison rather than return to the hospital. But this is purely fictional. We know, of course, that lawyers and judges constantly employ fictions when unable or unwilling to cope with reality. They are often comparable, as Dean Pound put it "to the 'let's play' this or that of children."[4] Their use has been both criticized and commended. Bentham was unsparing in his criticisms: "In English law," he wrote, *"fiction is a syphilis,* which runs in every vein, and carries into every part of the system the principle of rottenness."[5] Blackstone's view was somewhat more charitable, though even he speaks of fictions as "strange reasoning [to which] were our ancestors obliged to have recourse."[6] It is my opinion that a modern court, if it is to employ fictions, should state frankly the considerations of policy justifying the result ordained by the fiction (here that the parents pay for the policeman's injuries because they "knew" what Gordon was going to do). The difficulty with the result that the parents must pay damages for Gordon's wrong is that it is at war with the present philosophy of the tort law, that liability be based on fault. Just what fault these parents committed, unless it was to bring this unfortunate boy into the world, I have been unable to discover. Their care has been unremitting. They sent him away to military school, hoping the discipline would help him. They consulted with his teachers. They took him to medical experts. They

---

4 Pound, Interpretations of Legal History 4 (1923).

5 Bentham, On the Art of Packing Special Juries, 5 Works 92 (Bowring ed 1843).

6 2 Blackstone, Commentaries 360.

even had him confined, when his condition seemed to so warrant. They followed whatever medical advice was given them. On this particular occasion, all they did was to receive him in their home. They had not asked for his parole and, as we have pointed out, they were given no warning whatever as to what might happen.

If, indeed, the doctors themselves knew; this is not to place the blame on them. In a similar case (involving an allegedly negligent release of a schizophrenic from a State hospital) the appellate division of the New York supreme court recently said, "The diagnosis of mental cases is not an exact science.  *  *  *  Diagnosis with absolute precision and certainty is impossible.  *  *  *  Insanity is difficult of detection and frequently is cunningly concealed."[7]

The solution for this tragic situation is to be found in the legislative, not the judicial, councils. All that a court can say in a tort action is that a particular plaintiff wins or loses against a particular defendant. Here a broader treatment is required. Society reaps long-range benefits, both humanitarian and financial, from the therapy of parole. Yet, since diagnosis is not an exact science, errors there will be. Their cost is properly a cost of government, a burden to be spread among the citizenry, not allowed to rest where it may fall, on the injured party. Yet the courts cannot so spread, it must be done by the legislature.

As to duty then, when Mr. Justice BLACK concludes that the trial judge "could do naught but submit the case according to the above rules of duty" he is in error. Nothing in the "rules of duty" cited governs this case. None involves the liability of the custodian of a mental patient upon temporary parole author-

---

[7] *St. George* v. *State of New York* (1954), 283 App Div 245, 248 (127 NYS2d 147, 150).

ized by the confining and treating medical authority. In such case the normal parent-child relationship has been superseded by a composite of doctor-patient, institution-inmate, and custodian-parolee relationships. The considerations of policy underlying decision in the normal parent-child situation have been replaced by others of far greater complexity involving, now, the sovereign State, its agents, its wards, and the general public.

The insurmountable obstacle to plaintiff's recovery against these parents lies in the concept of duty. As Mr. Justice Cardozo put it, "The risk reasonably to be perceived defines the duty to be obeyed."[8] Who foresaw this risk? Did the doctors? Obviously not, or Gordon would not have been paroled. And if the doctors could not foresee it, we should not, paraphrasing Dean Pound, say "let's play that the parents did" and thus hold them liable.

Motions for directed verdicts should have been granted. Reversed. Costs to appellants.

OTIS M. SMITH, J., took no part in the decision of this case.

---

[8] *Palsgraf* v. *Long Island R. Co.* (1928), 248 NY 339, 344 (162 NE 99, 100, 59 ALR 1253, 1256).